Hillsborough, }
June 1, 1926. }

### Robert F. Bursiel v. Boston & Maine Railroad.

The fact that a pedestrian has nothing to control except his own locomotion is a distinguishing circumstance of material importance on the issue of contributory negligence.

The fact that a train was traveling at an unreasonable rate of speed or in an unusual manner when it struck a pedestrian crossing the track will not support a finding of due care on his part in the absence of evidence that he was relying upon its approaching at a slower rate, or in the usual manner.

The plaintiff's testimony that he looked for a train before stepping upon the track conclusively negatives the claim that he relied upon there being no train approaching at that time.

The last clear chance doctrine has no application when it is clear upon the evidence that there was no time when the defendent could have saved the plaintiff after he could not, by the exercise of ordinary care, have saved himself.

The conclusion that a locomotive engineer actually saw a pedestrian on the track ahead of the engine is not warranted by evidence that he might have seen him. Such a conclusion would be pure conjecture.

Case, for negligence. Trial by jury and verdict for the defendant. Transferred by *Branch*, C. J., on the plaintiff's exceptions to the charge, and on the defendant's exceptions to the denial of its motion for a nonsuit and for a directed verdict. The defendant submitted no evidence.

The plaintiff was struck and injured by one of the defendant's trains while he was crossing its tracks at the Manchester station. Granite street crosses the railroad tracks substantially at right angles at a point about three hundred and fifty-three feet north of the center of the station. The station platform is on the westerly side of the depot, its northerly end extending to the street. It is intersected by two parallel tracks, the inner side of the inner rails being 8.3 feet apart. These are the main and only tracks passing the station, the easterly track being known as the north-bound track, and the westerly one as the south-bound track. Upon either side of this double track the platforms are covered by separate open awnings or roofs supported by posts. The space between the tracks is filled with concrete or cinders to the level of the tops of the rails the entire length of the platforms. Opposite the station proper, the space between the rails of each track is filled with concrete to afford convenient passage between the easterly and westerly portions of the platform for passengers and baggage trucks. Between the northerly end of this concrete flooring and Granite street, a distance of two hundred forty feet, the spaces between the rails are unfilled. Passengers, in taking or leaving trains, sometimes cross these unfilled spaces. Granite street is protected by gates, operated by a gate tender stationed north of the street and west of the tracks.

The plaintiff, a milkman, came to the station to leave empty milk cans for shipment. These were to be delivered near the cab stand upon the easterly platform at a point about twenty feet north of the station. He approached from the west by Granite street, stopping his truck alongside the northwest corner of the westerly platform near the street. Upon his arrival a long freight train upon the easterly track was passing northerly through the station. Without waiting for the train to pass he proceeded to unload and transport his cans. There were twelve eight-and-a-half-quart cans tied together in three bunches of four cans each. He carried two bunches across the westerly track and deposited them in the 8.3-foot space between the two tracks at a point opposite the place by the cab stand where they were to be left and from which he was separated by the moving freight, and thereupon returned to his truck. While proceeding with the remaining bunch of four cans southerly and diagonally across the south-bound track, and when he was at a point about one hundred forty feet southerly of Granite street, he was overtaken and struck by the left-hand side of the pilot of the engine of the defendant's passenger train approaching from the

north.   The plaintiff testified that, before crossing the track with
the second lot of cans and when about eight feet west of the westerly
rail, he looked to the north and, seeing no train, proceeded southerly
and diagonally across the track, and had traveled about twenty-five
feet when he was struck.   The speed of the approaching train at
Granite street was variously estimated at from ten to twenty-five
miles per hour.   The plaintiff was traveling about three miles per
hour.   The accident occurred at about 5.49 o'clock A.M., about
daybreak.   It was snowing.   The passenger train was five minutes
late.   There was no evidence that the plaintiff knew of, or relied
upon, the scheduled time of the train.   Other facts appear in the
opinion.

*Robert W. Upton* (by brief and orally), for the plaintiff.

*Warren, Howe & Wilson* (*Mr. Howe* orally), for the defendant.

SNOW, J.   The defendant's motion for a nonsuit should have
been granted.

The plaintiff was forty-six years of age.   There is no evidence
that he was not endowed with average intelligence and possessed
of all his senses.

For ten years he had been coming to this station to get milk off
the trains, "any time from half past seven in the morning until
five o'clock at night."   He must have had some conception of the
frequency with which the main and only tracks through the city
at this point were in use.   The plaintiff knew all the conditions that
impeded his view or interfered with his hearing approaching trains;
namely, that it was snowing, that it was just about daybreak and
that the freight train was passing.   If he could see only a limited
distance up the track because of snow and darkness, or could hear
less distinctly because of the passing freight, reasonable care re-
quired greater precaution.

The fact that a pedestrian has nothing to control except his own
locomotion is a distinguishing circumstance of material importance
on the issue of contributory negligence.   *Olsen* v. *Railroad, ante,* 120.
The plaintiff was burdened only with four empty cans and was
impelled by no haste.   He was the only person upon the platform
west of the easterly track.   He selected a place for crossing the
track at a point where the space between the rails had not been
filled and was undesigned for passage.   It must be found that the
ordinary man, in the situation of the plaintiff, with his back turned

to a possibly approaching train from the north, would not have walked twenty-five feet diagonally down between the rails of the unfilled track without looking again, unless for some reason "he had reasonable ground for believing, and did believe, that no train would pass over the track" at that time. *Bourassa* v. *Railway*, 75 N. H. 359, 360. The evidence supports neither the existence of, nor a reasonable basis for, such a belief.

To bring himself within the principles laid down in *Bourassa* v. *Railway, supra, Minot* v. *Railroad*, 73 N. H. 317, and *Piper* v. *Railroad*, 75 N. H. 228, the plaintiff sets up in argument (1) a speed of the train in excess of the speed at which he had sometimes observed trains enter the station, and his reliance upon the latter, and (2) a custom of the railroad not to permit a train to enter a station when another train was moving out, and his reliance thereon.

The only evidence bearing on the speed of entering trains was the testimony of the plaintiff's witness Lyons that this train came in at Granite street at twenty to twenty-five miles per hour; the testimony of the plaintiff's witness Fisher that it came in at fifteen to twenty miles per hour; the engineer's statements that his train crossed Granite street at ten miles per hour, that it was a bad morning, and that "as a general thing" he "came over that crossing slow anyway"; and the plaintiff's testimony that he had seen trains draw in there from the north "around ten or fifteen miles an hour."

Unless this evidence can be so construed, there was no evidence that twenty-five miles an hour was an unusual or an unreasonable rate of speed for a train to enter the station at Granite street. The train was a through train running from Newport, Vermont, to Boston. There were ten cars on the train, which was drawn by a large engine of the Pacific type. The train was presumably to make the station stop, with the passenger coaches in front of the station, and therefore had several hundred feet to go after the engine crossed the street before it would come to a stop. The street was protected by gates. It certainly cannot be presumed on this evidence that twenty-five miles an hour would be regarded by the average person as an excessive speed for the engine to pass Granite street.

If, however, on the evidence, the speed could be found to be unreasonable, there was no evidence that the plaintiff was relying upon the train approaching at a lower rate. The plaintiff claimed no knowledge of the customary speed or movements of this train, or of trains running on a similar schedule. His only reference to its speed in

relation to his movement was that, if it had approached at ten to fifteen miles per hour, he would have had "plenty of time"; that is, plenty of time to have leisurely (three miles per hour) walked diagonally down the track twenty-five feet, plus such further distance as he would have had to travel to reach a place of safety. His conduct under such conditions in turning his back to a possibly oncoming train while he slowly walked down the track established his negligence in the absence of some excusing circumstance. Such conduct is not itself evidence of reliance upon a slow speed of the train. The mere fact that the plaintiff had seen trains come in at ten to fifteen miles per hour did not justify a belief, nor furnish evidence of a reliance upon a belief, that no trains would ever come in at a higher rate of speed.

In proof of a custom of the railroad to refrain from entering a station by train while another train is pulling out the plaintiff offered his own testimony that, during the ten years that he had been coming to the station to get milk off the trains, he had never seen two trains come into the station in opposite directions at the same time, nor two trains in motion in the station at once, although he had seen two passenger trains stop there at the same time. He produced another witness, Lyons, who had been at the station "off and on" for ten or twelve years and who stated that he never saw two trains "coming in together at the same time" and had seen trains wait outside while others pulled in.

It is claimed that this custom was supported by the engineer's testimony that he had the right of way; that it was not the practice to allow a freight to enter the station when a passenger train was expected to stop; that if he had been on time the freight would not have been there; that therefore he slowed down so as to give it a chance to get by before he made his station stop; but that if a passenger train bound north had been standing in the station, he would not have come in without a motion. While the engineer admitted that the movements which were made here seldom occurred, he stated that it was liable to happen any time and that he knew of no reason why it should not happen. The only custom which the engineer's testimony supports was the practice of avoiding moving trains at stations at times when passengers might be entering or alighting from other trains. His evidence, therefore, tends to disprove rather than to prove the existence of the custom set up by the plaintiff.

But the issue here is not the existence of the alleged custom. We

are here considering the question of the plaintiff's, and not the defendant's, negligence. The subsidiary issue now under consideration is whether or not the knowledge the plaintiff had afforded him such a reasonable ground for belief in the existence of the custom that he could reasonably rely upon its protection while walking from the point of observation to the point of collision with his back turned in the direction from which, except for the custom, he must have known a train might be approaching.

The uncommunicated observations of the witness Lyons could have afforded no grounds for the plaintiff's expectations. Nor, as we have seen, could the practice, as defined by the engineer, furnish any basis for the plaintiff's belief in the existence of the claimed custom. It follows that the only evidence on which the plaintiff could have based his belief was what he, himself, had seen. The custom upon which his reliance is predicated was the practice of withholding trains from entering a station occupied by another moving train. It does not appear that he had seen an approaching train withheld outside a station until the departure of a moving train within. His testimony was merely that he had never seen two trains come into the station in opposite directions at the same time, nor two trains in motion in the station at once. He had no knowledge of the customary movement of this train, or of trains under circumstances such as were presented here. It cannot be found that a reasonable man upon the negative and indefinite evidence afforded by his experience would have entertained a belief in the existence of the alleged practice, or, if it could be so found, that he would have exposed himself to the potential danger of being run down in reliance upon its observance.

The evidence, moreover, affirmatively establishes that, if the plaintiff entertained such an unfounded belief, he did not in fact rely upon it. The following question and answer appear in the plaintiff's direct examination. "Q. And did you expect that morning with this freight train drawing out, in view of what you know of the custom there, did you expect there might be another train coming in? A. I did not know but what there might be. I looked north." It is a conclusive inference from this evidence that he was placing no reliance upon the supposed custom. His later testimony that he did not "expect" a train does not overcome this inference. Expecting a train and anticipating that one might be coming are quite different things. A person crossing a railroad track who fails to look, simply and solely because he did not expect a train, would be clearly charge-

able with contributory negligence in case of a collision. His unexplained denial upon cross-examination that he had testified that he "did not know but a train might be coming from the north" did not withdraw his admission. It merely denied, contrary to the truth, that he had made it. If, however, his denial could be construed as tantamount to a statement that his language upon direct examination was a slip of the tongue or that, by it, he did not mean what he said, his denial does not overcome the conclusive inference of non-reliance arising from his undenied admissions that he "looked." Several times after he had testified that he did not know but a train might be coming, and again several times after the denial thereof, in locating the point where he stood, and in describing his approach to the place of his observation and his movements afterwards, he reaffirmed his statement that he "looked." His first clear statement of what happened, which was neither denied nor qualified, was, "I looked down and I saw the end of the freight train; I looked north and I saw there was no train coming, and I started across." He was clearly relying upon his eyesight.

Where the conduct and knowledge of the plaintiff are fully disclosed and show nothing from which the use of care could be found, but, on the contrary, plainly establish his negligence, the defendant is entitled to a directed verdict. If the plaintiff's reliance upon a custom which he supposed existed could suffice to excuse his otherwise negligent conduct, it would not avail him, for he did not testify that he relied upon the supposed custom. Counsel, however, offers the plaintiff's evidence of his habit to overcome the inference normally to be drawn from his admitted conduct. "I looked because it was my custom to look . . . I always look when I go across a railroad track, I am accustomed to look." This evidence does not defeat the natural inference of non-reliance upon the absence of a train which must be drawn from the act of looking for a train. It cannot be understood that the plaintiff's act of looking was a mere involuntary or instinctive physical motion devoid of intelligence. If it were so, then the act was no evidence of care. The ordinary person who is habitually careful in looking for passing trains at crossings does something more than turn his head. He also thinks whether a train is approaching. The act of looking is "a physical motion plus a mental process." See 39 Harv. L. Rev. 852. The habit, to amount to care, includes an attempt to exercise the sense of vision and thinking whether a train is approaching. It is impossible to conceive of the exercise of care through the eyesight in such a case without some

exercise of the mental powers. There was no object in looking, however the act was prompted, except to see. The object for which he was looking was necessarily a possibly approaching train. Looking for a train includes a mental process which is necessarily inconsistent with reliance upon the absence of a train.

The facts do not bring the case within the principles of the *Bourassa*, *Piper*, and *Minot* cases, and accordingly we have to hold that it conclusively appears from the evidence that the plaintiff's injury was due to his failure to exercise ordinary care for his own safety.

The plaintiff's contention that he was entitled to go to the jury under the last clear chance doctrine is without merit. This position is based upon the claim that the enginemen and the gate tender severally had the last opportunity to avert the accident. Inasmuch as it appears from the evidence that the plaintiff was himself negligently inattentive up to the moment of impact, this contention raises the question whether or not it could be found on the evidence that there was any time preceding the collision when the enginemen or gatetender, one or all of them, observing the plaintiff and being themselves in a position in which as reasonable men they should have realized his inattention, could by the exercise of care have saved him from his own negligence. *Lee* v. *Hustis*, 79 N. H. 434, 435; *Olsen* v. *Railroad*, 82 N. H. 120, 124.

The plaintiff's claim of superior knowledge on the part of the enginemen fails for lack of evidence. There was evidence that it was snowing. The plaintiff's witness Fisher testified that it was snowing "pretty hard." The engineer, called by the plaintiff, testified that the snow was blowing from the awnings and the tops of the passing freight cars; that he did not see the plaintiff, and that neither he nor the fireman could have seen whether or not anyone was on the track. The fireman was not a witness and there was no evidence of what he did, except that he was at his post of duty ringing the bell and looking ahead. It would be permitting the jury to conjecture if they were allowed to infer from the mere presence of the parties, under the conditions disclosed by the evidence, that either of the enginemen not only saw the plaintiff but also appreciated his inattention.

The plaintiff's witness Lyons, approaching the Granite street crossing from the west, heard a voice saying, "Get out of the way, look out." The plaintiff reasons that, as the gate tender's place of work commanded a view of the station platform, as neither the engineer nor the fireman saw the plaintiff and as there was no evidence

that anyone else was present, therefore, the jury might find that the voice was that of the gate tender; that accordingly it could be found that the tender must have seen the plaintiff and that, therefore, he might have stopped the train by use of his emergency lantern or sooner warned the plaintiff, and thus have avoided the accident. No suggestion is made as to the identity of the tender or of his voice, or the direction from which the voice came. That it hailed from the gate tender rather than from a brakeman or other operative on the freight train, or from another pedestrian on Granite street, is the merest surmise. Unless the statement of Lyons can be so construed, there was no evidence of the presence and action of the gate tender, or of his duties, except as inferences might be drawn from the fact that there was a gate tender's shanty at Granite street and that the gates were down while the freight train was pulling through the station. It is not claimed that there was any evidence that the gate tender was in fact charged with any duty with respect to pedestrians on the station platform, but the plaintiff argues that their need of protection was nearly as great as the need of protection to travelers crossing the railroad tracks at Granite street, and that the jury might find that the defendant should have charged the gate tender with their care. The difficulties with this position are manifold. It could not be found that a person of average prudence in the position of the railroad would charge a gate tender at such a busy crossing with the additional care and protection of people upon the station platforms, since such distraction from his duties as tender would necessarily be fraught with great danger to the traveling public. If, however, it could be found upon such conjectural evidence that the tender was charged with any duty toward the plaintiff, that he saw the predicament in which the plaintiff had placed himself and that the latter was mentally absent, it is clear that there was no time thereafter when the tender could have signaled the engineer in season to enable him to stop the train in time to save the plaintiff from the consequence of his own negligence.

On the evidence the last clear chance doctrine has no application.

The conclusions reached make it unnecessary to consider the plaintiff's exceptions.

*Judgment for the defendant.*

BRANCH, J., did not sit: the others concurred.