Hillsborough, }
March 6, 1928. }

ANSON G. OSGOOD, *Adm'r, v.* BOSTON & MAINE RAILROAD.

JAMES J. POWERS, *Adm'r, v.* SAME.

*Osgood & Osgood* (*Mr. Anson G. Osgood* orally), for the plaintiffs.

*Warren, Howe & Wilson* (*Mr. Howe* orally), for the defendant.

SNOW, J. It is the plaintiffs' primary contention that the gateman failed in his duty to their intestates in permitting the car to enter upon the crossing in view of the proximity of the on-coming train. The question presented is whether the likelihood or probability of a collision was such that no person of ordinary prudence in the position of the gateman, in the situation there existing, would have permitted the car to enter upon the tracks when and as he did. *Derosier* v. *Company*, 81 N. H. 451, 459, 461, 463; *Tullgren* v. *Company*, 82 N. H. 268, 276, 277.

For the period of time which was allowed Carlton for the crossing we are wholly dependent upon the statement of Milne, who testified that the car proceeding at a continuing speed, which "may have been" "ten or eleven, or maybe fifteen" miles per hour, was stalled upon the easterly edge of the south-bound track for a period of five or six seconds, and again upon the westerly edge of that track for two and a half to three seconds when and where it was struck by the engine. It conclusively appears that except for the stallings of the car the accident would not have occurred. On the evidence most favorable to the plaintiffs, both as respects the speed (10 miles per hour) and the delay due to the stallings (7.5 seconds), the car, except for the time lost by such stallings, would have been somewhat more than one hundred feet past the point of collision on arrival of the train.

The only evidence offered of unusual conditions here bearing on the likelihood of cars stalling was the presence of a rise of four or five inches in the asphalt surface of the crossing between the tracks in one or two places and extending the width of the street. Opinions were given that differences in level have a tendency, by lowering the foot of an operator, to feed gas quickly and choke the motor and thus decrease the speed; and that a car is more likely to stall when going "slow." What was meant by "slow" is not defined. It is not to be inferred, however, that the witnesses meant that a speed of ten miles per hour was likely to induce stalling, and

it could not be found on the evidence that the gateman should have anticipated a reduction of the speed of the car below that rate. On the other hand, it affirmatively appears that Carlton proceeded at a uniform speed of ten, eleven or fifteen miles per hour until the car stalled on the easterly edge of the south-bound track. The inconsiderable variations in level shown, in view of the absence of evidence that vehicles had ever before stalled or experienced any similar difficulty at this crossing, do not afford a sufficient basis for a finding that the gateman should reasonably have anticipated that it was so probable that such minor surface conditions would induce the stalling of cars without fault of the driver that he should for that reason have made a special or additional allowance of time for meeting such a contingency.

The plaintiffs urge, however, that, in addition to the time required to safely make the crossing under normal conditions, and apart from the defective conditions claimed, it was the gateman's duty to allow for a margin of safety for travelers to extricate themselves from peril in case of accidents which might befall their car while making a crossing; and argue that a variety of likely happenings might occur, such as (to use their illustrations) stalling, breaking an axle or rear-housing, or losing a wheel or tire; that it was not necessary that the gateman should have anticipated the precise danger or damage occasioned but only some danger or damage of a similar nature. It is true that, under the rule of reasonable anticipation, it is not necessary that the gateman should have had reason to anticipate that his alleged wrongful conduct should become operative to the deceased's injury in the exact way in which it did. *Derosier* v. *Company, supra,* 461, 462. When, however, as under the premise here assumed, the plaintiffs' sole claim is that such conduct was likely to become operative to produce their injury only upon the happening of some contingency, there must be evidence of such a likelihood of the happening of that contingency, or of similar contingencies, as would have impelled an ordinarily prudent man in the gateman's position to take protective action to meet it. Upon this point the plaintiffs must fail for want of proof. There was no evidence from which it could be found that cars had ever before stalled, or met with any of the enumerated or similar difficulties, upon this or any other crossing; or that this car, either with or without the knowledge of the defendant, had ever stalled at any time or place. Nor is there any merit in the argument advanced that the general likelihood of cars stalling was so far a matter of common knowledge that the jury

could find that the gateman was chargeable therewith. If it be true as urged in argument that it is a common occurrence at highway crossings for cars to be stalled when they are obliged to slow down at the behest of an officer or for the purpose of safety, a comparable situation is not presented.

It is not necessary to decide whether, in view of the requirements of modern travel, a jury will be allowed to find that a reasonably prudent man in the position of the gateman under normal conditions might not have considered as an adequate allowance to make the crossing, a period which admitted, not only of safely crossing the tracks at a speed of ten miles per hour, but, while continuing at the same slow speed, of reaching a point more than one hundred feet beyond the danger line. Upon the question whether there was findable negligence in the conduct of the gateman here in failing to lower the gates, the situation in which he was placed by reason of the conduct and ostensible purpose of Carlton, as they must have appeared from the gateman's position, is an important factor.

P. L., c. 249, ss. 15, 16, 22, provide that municipalities shall place warning signs on every highway approaching railroad crossings at grade at a reasonable distance, of not less than three hundred feet, from such crossing; and require that the driver of an automobile passing such a sign shall, subject to penalty, reduce his speed to within ten miles per hour for the last one hundred feet before reaching the crossing. The evidence discloses the presence of such a sign on Canal street north of its junction with West Central, substantially three hundred feet from the nearest rail measured on the center lines of the roadways of said streets. If it be assumed that the roadway of Canal street is of the same width as that of West Central, this distance would appear to be two hundred ninety-nine feet and two inches. The width of the roadway of Canal street not being in evidence, it does not definitely appear whether or not the sign was the full required three hundred feet from the crossing. If, however, it be assumed that the city made such an inconsiderable mistake in the placement of the sign which ordinary observation would not disclose, neither the defendant nor its servants are chargeable with knowledge of such error. It follows that the gateman had no reason to anticipate the approach of a car from Canal street at a greater speed than ten miles an hour, and could not be found negligent because he failed to sooner lower the gates in anticipation of an approach at a greater speed.

It is conceded that Carlton came past this sign on Canal street

and turned west on West Central at a point sixty-one feet from the nearest rail. His car proceeding at ten miles an hour could be stopped within a distance of twelve feet. For the adequate protection of a vehicle so approaching at lawful speed there appears to have been no occasion to lower the gates until after the car had entered upon the latter street. After the car entered West Central street so as to be fully within the gateman's view its front must have been within slightly more than fifty feet from the gate. The car came upon Milne, only thirty feet from the crossing, "all at once" going at an indefinite speed, as he testified, of ten to fifteen miles an hour and continued on to the crossing with undiminished speed. The movement of the car so impressed the witness that he turned around to see "if he [Carlton] was going to go through the gates . . . if they were down." He thought that "something might happen out of the usual," that Carlton would "have to do some tall stopping." The gateman standing at the gate-control could plainly see all that Milne saw, and there is nothing to show that he should have had any different impression. He was charged with responsibility and the time for decision and action was short. There remained but three to four seconds for the gatekeeper to decide to act, and for the car to come to a stop to prevent its collision with the gates. Whether this could have been accomplished is at least doubtful. The evidence thus conclusively shows that the gateman was confronted by an emergency in which he had to choose between two courses of action, either one of which was fraught with possible danger to the deceased. He could lower the gates with the probability that the car would crash into them, or he could permit it to cross in advance of the train with what appeared to be, and what proved to be except for the unforeseeable stalling of the car, a safe margin. His adoption of the latter course under the circumstances was not fairly findable as negligent.

There is no claim that the enginemen could have seen the stalled car in season to have avoided the collision. But it is argued that after it became stalled the gateman, by the use of his red lantern, could have warned both the engineer and the occupants of the car so that the former could have reduced the speed of the train and the latter been given a longer time to act for their own safety. Here again the plaintiffs must fail for the want of evidence.

There is no evidence that the gateman saw Carlton's peril until he "hollered" to him. This verbal warning was given while the car was stalled on the track, or, to use the further language of the wit-

ness, "as the train approached the automobile." This evidence tends to show that this was during the period of the last stalling. It was then manifestly too late for the gateman to effect a rescue. *Bursiel* v. *Railroad*, 82 N. H. 363, 370, 371, and cases cited. If, however, it could be found that the gateman's verbal warning was given while the car was first stalled, the evidence would not support a finding that he could then have prevented the accident. The gateman, beside keeping track of the train and moving his gates, had a duty to watch both approaches to the crossing as well as travelers in the act of crossing. When the car passed the witness the gateman was still at his post and facing east, and, as the car got upon the north-bound track, the east gates were tipped slightly. When he "hollered" he was still standing at the gate-control and was next observed upon the opposite or east side of his shanty, where he was seen by Milne to pick up a red lantern and wave it for the train to stop, which the witness describes as "a kind of a swing around about three times quick." The train was then "close to the shanty" and only a few feet away. An appreciable period of time was required to register upon the mind of the gateman the peril of Carlton, and for him to decide upon his course of action. Some time was necessarily consumed in giving the verbal warning. There was no evidence of the time required for the tender to leave his place at the gate-control, go to the other side of his shanty and secure and wave his lantern. Time was likewise required to register the signal on the mind of the engineer and for an effective application of the brakes. There was an absence of evidence as to the distance in which the train could have been brought to a stop, except so far as it may be inferred from the fact that the train stopped, on the signal given, with the rear car of the train upon the crossing. Therefore, if it could be found that the gateman saw the car during the period of the first stalling, in the absence of more explicit evidence, it would have been mere conjecture for the jury to find that he would have been able, by means of his lantern signal, operating through the enginemen, to have prevented the collision. Nor does the evidence warrant a finding that the deceased would have observed an earlier signal and left their car in season to save themselves. If the deceased saw the on-coming train the signal would have told them nothing which they did not know. If they did not see the train it is merely conjectural to say that they would have observed a lantern signal and, observing it, have abandoned their car. *Collette* v. *Railroad, ante*, 210.

There was an absence of evidence whether the windows of the car were open or closed. In view of the season and the time of day, the latter is at least as probable. Carlton's hearing was defective. It would, therefore, be likewise conjectural that an earlier, or a continued, verbal warning would both have reached the occupants of the car and have impelled them to greater, or to a different kind of, protective action than they took.

The claim that negligence of the defendant can be predicated upon an excessive speed of the train operating to the deception of the gateman is not well founded. The only evidence of the speed of the train was by Milne, who says he "glanced up" the track from a position 30 feet from the crossing and saw the train "as much as four poles" away, "coming towards me — looked to be going at a great speed," "about forty miles" per hour, or as he further states "about as fast as it usually does." This testimony does not support findings either that forty miles an hour was an excessive or an unusual rate, or that the gateman was deceived thereby.

Other exceptions shown by the record have not been argued and are understood to be waived.

*Exceptions overruled.*

All concurred.