## BUTLAND v. MAINE CENT. R. CO.
### No. 3128.

Circuit Court of Appeals, First Circuit.
June 11, 1936.

358

Alexander Murchie, of Concord, N. H. (Frank R. Kenison, of Conway, N. H., and Murchie, Murchie & Blandin, of Concord, N. H., on the brief), for appellant.

Irving A. Hinkley, of Lancaster, N. H., for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This was an action for personal injuries resulting in the death of the plaintiff's intestate, brought in the superior court for the county of Carroll in the state of New Hampshire, and transferred to the federal District Court for New Hampshire on motion of the defendant and there tried.

The presiding justice granted a motion of the defendant for a directed verdict. From this order the plaintiff appealed, assigning as errors: (1) The admission of a certain paper admitted to have been written by the plaintiff's intestate, indicating that at some time the deceased had a suicidal intent; (2) that the court erred in permitting an amendment to the defendant's pleadings alleging that the deceased committed suicide; (3) that the court erred in granting the defendant's motion for a directed verdict.

The first two assignments of error were not argued, and we think, in view of the evidence, if not waived, cannot be sustained.

The real issue raised by the plaintiff is whether there was any evidence to go to the jury on the negligence of the defendant and whether the evidence conclusively shows that the death of the plaintiff's intestate was due to her own negligence.

The accident took place on a railroad bridge over the Saco river in New Hampshire, between Glen Station and Bartlett. The train causing the death of the intestate, who was the wife of the plaintiff, was a passenger train which left Portland on the morning of March 6, 1934, for Fabyans. The accident occurred just before 10 o'clock a. m.

The railroad, just before reaching the bridge on which the accident occurred, curves to the left for about 600 feet, so that the view of the easterly end of the bridge is shut off from the view of the engineer until within about 70 feet of the entrance to the bridge. The fireman, unless attending to his fires, from his side of the cab could see the entrance to the bridge for the entire distance of the curve. The bridge is over 300 feet long, and is not wide enough for a foot passenger to walk on it when a train enters without being struck. It was obviously not designed for foot traffic.

On a motion to direct a verdict for the defendant, a view of the evidence must be taken most favorable to the plaintiff.

It appeared from the evidence that the residents at each end of the bridge used the bridge in going from one side of the river to the other, though there are only a few houses on each side; and whether the use was so notorious as to amount to knowledge on the part of the defendant of such use may be doubtful. At least, its engineer, fireman, conductor, and brakeman on this train had no knowledge of such use.

It appeared that there were three paths leading from the highway from Glen to Bartlett, which at this point runs alongside the railroad tracks up a steep bank to the tracks near the easterly end of the bridge, which, it could be inferred, the people residing in the vicinity used in entering and leaving the bridge. From these paths the plaintiff contends that the defendant should have known of the use to which the bridge was put, and permitted its use, and should have kept a lookout to see that no one was using the

bridge when one of its trains approached the bridge; and, as there was some evidence that the fireman was looking out of the cab on the engineer's side watching a demonstration of snowplows on the highway, he relies on this as evidence of negligence on the part of the defendant, together with the fact that there was no sign warning trespassers from using the bridge for foot traffic.

Whether there was sufficient evidence of use of this bridge by foot traffic to amount to notice of that fact to the defendant and its assent, it could amount to no more than a license to use it when no train was using it. A licensee must be held to use it at his peril. The proper operation of its trains could not require the defendant, on coming around the curve, to decrease the speed of its trains until it was clear that a foot passenger was not using the bridge, which was a trap if one were caught after entering it. If there is evidence of a license, it must be that the licensee must take ordinary precaution to avoid being caught on the bridge.

However, assuming that the use of the bridge was so notorious as to require constant lookout by the fireman to discover whether any person was using it, and, if so, to warn the engineer in time to stop the train, the more serious question is whether the evidence does not conclusively disclose that the deceased was guilty of contributory negligence up to the moment of her injury.

It is urged that she had reason to suppose that the train due at the bridge at about 9:30 had gone and she could safely use the bridge; but railroads do not guarantee that their trains can always pass a given point at a definite time. Time tables change; trains often are late. If a person at a railroad crossing, before crossing, must stop, look, and listen, how much greater is the burden on a trespasser or mere licensee to take equal precaution before entering a bridge over 300 feet long, in which there is no room for a train and foot traffic, and the structure obviously was not constructed for such use by pedestrians.

Evidence was admitted of a conversation with her husband some distance up the track toward Glen Station, in which she asked him if it was all right for her to go to visit friends on the other side of the river, and he looked at his watch and told her it was approximately 10 o'clock and said she could go. He was then asked, "Did you say anything about the train having gone?" to which he replied: "Yes." What he said, whether it had gone or was late, does not appear. It had not gone. He admitted that it was not unusual for this train to be late; that his wife, who went for the mail at Glen, also would have occasion to know when it was late; that on March 3, before the accident, it was eighteen minutes late, and nine minutes late on March 2; that it was forty-five minutes late on February 27, but he did not notice it was thirty-two minutes late on February 28, and twenty-nine minutes late on March 1.

Following her conversation with her husband, Mrs. Butland followed the highway to a point opposite the second path from the easterly end of the railroad bridge. She then climbed the banking along the path to the roadbed and walked slowly along the track 35 feet without stopping and without looking back to see whether a train was coming entered the bridge, and, after she was in the bridge 10 or 15 feet, was struck by the train and instantly killed. She was found from 20 to 30 feet inside the bridge on the right-hand stringer. Her shoes had fallen off and were found below about 5 or 6 feet inside the stone abutment of the easterly end of the bridge; the stone abutment being 5 feet in width. If the place where her shoes fell indicates where she was struck, she had not progressed on the bridge more than 10 or 12 feet when hit. Her body was unquestionably thrown ahead when it was hit by a train going 35 miles an hour, so that it is beyond conjecture that she had not progressed inside the bridge more than 15 feet, if, indeed, the point where her shoes fell did not establish that it was less than that distance.

It was a windy day, but it seems incredible that she should not or could not have heard a train coming up a grade behind her at 35 miles an hour, if, with senses alert, she had exercised the care of a prudent person before entering the bridge. She knew the bridge was a place of danger; that trains might be passing at any time either because they were off schedule time or freight trains. Men on the highway from 200 to 600 feet from the easterly end of the bridge heard the train coming, although some of them were near a running motor and were engaged in watching snowplows.

360

The only two witnesses who saw Mrs. Butland just before and at the time she arrived on the track and entered the bridge testified as follows:

Clement C. Clark: "I was in the neighborhood of 300 feet from the easterly end of the bridge when the train went by toward Bartlett. In turning around to look at the train I didn't catch a glimpse of some person on the bridge, but on the side of the railroad track at this end of the bridge. That person hadn't reached the bridge.

"I would say I was approximately 300 feet down here from the end of the bridge with a Walters plow. The plow was being demonstrated. The motor of the truck was going. As I stood there something attracted my attention to the coming train. There might have been a noise. There was more or less noise. Any train makes a noise. It was going on an up grade and around a curve and making noise enough so that Mr. Brooks, who was with the plow that was in motion, heard it. I did not look up there and see a person near the end of the bridge. I wouldn't say she was in the bridge or on the track. I think I saw the woman before I did the train, momentarily, just as you would turn your head. I got a glimpse of her and almost at the same moment I turned my head to see the train going ·by. I went up there afterwards and saw where her body was laying. It was not over 25 or 30 feet from the easterly end of the bridge."

Mr. Albert W. Paul, the only witness to the accident, testified that he was 150 to 200 feet nearer the bridge than he was at Cannell's place. "I was then between Cannell's and the bridge"; that is, he was west 150 to 200 feet from Cannell's place, which was approximately 400 to 500 feet from the easterly end of the bridge. He was traveling westerly along the highway toward the bridge. He testified that he saw somebody go up the second path from the bridge onto the track. It was a woman, and he recognized her as Mrs. Butland. "As she walked up and on to the track she did not look behind her at all. She was going right through the bridge. She didn't look either way. She did not turn around at any time before she was struck. She had on a bluish coat, collar up on her head over her neck. The wind was blowing in her face. She was walking ·kind of

slow. She was stooped over. When she· disappeared from my view she wasn't any more than 10 feet into the bridge. That would be when the engine got in between me and her so that I could not see her." He further testified: "I was 150 to 200 feet from the end of the bridge when I saw this woman go up the path and onto the railroad. She went right onto the track or onto the roadbed and never looked down easterly at all. When I saw the train Mrs. Butland was into the bridge. I was from 10 to 20 feet nearer to the end of the bridge when the train came by me than I was when I first noticed the woman going up the path."

This is practically all the testimony as to what precaution Mrs. Butland took before entering the bridge and the distance of the train from the bridge when she entered upon the roadbed and went into the bridge.

From this evidence from the plaintiff's own witnesses, Mrs. Butland, without taking the slightest precaution to see whether a train was coming, entered upon the roadbed of the railroad and deliberately walked into a bridge 331 feet long, which constituted a trap from which there was no escape in case a train came along, without even taking the precaution that a person is required to take in crossing a railroad track in a street.

She was walking slowly according to the witness Paul, probably traveling at less than 4½ feet per second, while the train was traveling at the rate of 51 feet per second. In other words, if she had not gone into the bridge more than 15 feet when she was struck, or perhaps 20 feet from the easterly edge of the abutment, where she could have stepped aside in safety, while she was going that distance the train would have traveled approximately 250 to 300 feet. It is incredible, with her senses alert as she was about to enter what she must have known was a place of danger, that she should not have heard the oncoming train, even though she did not look.

◾ Suffering from a serious gall bladder infection and a "bad heart," a letter found in her pocket by the medical examiner may well have been significant in explanation of her indifference to danger, which reads as follows: "Dear Forrest: Forgive me & take good care of the children & tell them its for the best & Ada Fisher my sister is to be guardian over my house

and property & they will take care of everything Arlene & Elaine Butland to be beneficiaries of the house and Forrest the money in my pocket book Tell Ada and Ma to forgive and forget me.

"Ella & Mother."

Her family undertook to counteract the effect of this letter by explaining that the ink with the paper on which it was written had been used up at Christmastime. However, assuming that it was written before Christmas, nearly three months before she walked into the bridge without even looking for a train that was approximately 300 feet away and coming at the rate of 35 miles per hour, from which, after entering the bridge, there was no escape, she still had the note in her possession on this morning, indicating that life had little in store for her, if it did not indicate a continuing suicidal intent. Even though she had no deliberately formed intent to commit suicide on this morning, the evidence, at least, indicated an indifference to danger.

While both the law of New Hampshire and the rule in the federal courts place the burden of proving contributory negligence on the defendant, where all the evidence as to the due care of the plaintiff's intestate comes from his own witnesses, the language of the court in Batchelder v. Boston & M. Railroad, 72 N.H. 528, 57 A. 926, before the shifting of the burden from the plaintiff to the defendant, is equally applicable to this case. There the plaintiff was either a licensee or a trespasser:

"If it might be found from the evidence that the defendants would have discovered the plaintiff in time to prevent the accident if they had used ordinary care, it cannot be found that she would not have seen the train in time to escape injury if she had used the same care."

"A person crossing a railroad track, who fails to look simply and solely because he did not expect a train, would be clearly chargeable with contributory negligence in case of a collision. * * *

"Where the conduct and knowledge of the plaintiff are fully disclosed and show nothing from which the use of care could be found, but, on the contrary, plainly establish his negligence, the defendant is entitled to a directed verdict." Bursiel v. Boston & M. Railroad, 82 N.H. 363, 368, 369, 134 A. 40, 43.

"One does not use due care for his safety who does not think at all about it. * * * Collette v. Boston & M. Railroad, 83 N.H. 210, 217, 140 A. 176. The duty to give attention to one's safety in a position of obvious danger is imposed because the ordinary man gives that attention." Robinson v. Boston & M. Railroad, 85 N.H. 474, 475, 476, 160 A. 473, 474.

Also see Bonnin v. Boston & M. Railroad, 77 N.H. 559, 562, 94 A. 196.

In the case of Chicago, R. I. & P. Railroad Co. v. Houston, 95 U.S. 697, 702, 24 L.Ed. 542, the court said:

"Negligence of the company's employees in these particulars was no excuse for negligence on her part. She was bound to listen and to look, before attempting to cross the railroad track, in order to avoid an approaching train, and not to walk carelessly into the place of possible danger. Had she used her senses, she could not have failed both to hear and to see the train which was coming. If she omitted to use them, and walked thoughtlessly upon the track, she was guilty of culpable negligence, and so far contributed to her injuries as to deprive her of any right to complain of others."

In the case of Baltimore & O. Railroad v. Goodman, 275 U.S. 66, 69, 48 S.Ct. 24, 25, 72 L.Ed. 167, 56 A.L.R. 645, the court also said:

"When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk."

Her failure to look or listen before entering a bridge from which there was no escape if a train came along constituted negligence and contributed to her fatal injuries.

The judgment of the District Court is affirmed, with costs.

BINGHAM, Circuit Judge, concurs in the result.