Coös,         �months
Oct. 3, 1916. ⎰

FRANK NAPPI, *Adm'r.*, v. GRAND TRUNK RAILWAY COMPANY.

The duty imposed upon railroads by the fencing statute (P. S., c. 159, s. 23), is to
fence their tracks against domestic animals and not against people.

An infant trespasser upon the tracks of a railroad at a place where children were
accustomed to play was killed by the shifting of cars. In the absence of any
negligence by the shifting crew in failing to discover the child's presence,
the railroad was not liable.

CASE, for negligence. Trial by jury. At the close of all the evidence the defendants' motion that the court direct a verdict for the defendants was granted, subject to the plaintiff's exception. Transferred from the December term, 1915, of the superior court, by *Chamberlin*, J.

The plaintiff's intestate was his four year old son, who, on May 6, 1915, was run over and killed by a freight car of the defendants on the Longfield siding in the east yard at Gorham, N. H. The plaintiff's intestate lived with his parents in Gorham, and the Nappi house fronted on the south side of the right of way of the Grand Trunk Railway's east yard.

About four hundred and fifty feet west of the Nappi house the yard and tracks of the defendants are crossed at grade by a highway called Glen street. Extensive yards with side tracks and switches have been built in the village of Gorham. Beside the main line which runs through the village, side tracks, connecting with the main line and with each other by means of switches, have been constructed, and are used for switching cars, making up trains and general yard purposes. The portion of the right of way east of the Glen street crossing as far as the Peabody river is sometimes called the east yard, while the portion west of Glen street crossing is known as the west yard. Both portions are in reality one yard and are used for switching cars, making up trains and for doing other yard work.

Main street runs on the north side of the railway yard and tracks, and is substantially parallel with them, and dwelling houses have been built and occupied on substantially both sides of this street.

Washington street lies on the south side of the east yard and extends easterly from Glen street. On the south beyond Washington street are the lumber yard and mills of E. Libby & Sons Company.

The total length of the east yard from the Glen street crossing to

the railroad bridge over Peabody river is fifteen hundred and forty-nine feet. The width of this yard between Main street on the north and Washington street on the south is ninety-nine feet. The part used for tracks has been graded and is generally higher than the land on each side. About midway between the crossing and the bridge the land on the south side is as high or higher than the graded part of the right of way. This is easterly of the Nappi house and at this point a side track leaves the yard and runs to E. Libby & Sons Company's mill.

The trackage in the east yard consists of one straight main line track, two side tracks (called Flynn's siding and Longfield's siding), and the spur track leading to Libby & Sons Company's mill, before mentioned. All of these side tracks are on the southerly side of the main line. The first side track on the southerly side of the main line is called the Flynn, or scales siding. Flynn's siding starts from the main line near Peabody River bridge, runs westerly beside the main line to a point somewhere west of the Glen street crossing, in the defendants' yard, and there connects with the main line.

A little west of the easterly end of the Flynn siding, the Longfield siding leads off on the south side and runs westerly, next and parallel to the Flynn siding, past the Nappi house, nearly to the Glen street crossing. The Longfield siding, upon which the intestate was killed, can be entered only by means of the switch in the Flynn siding at the easterly end of the Longfield siding.

Between the railway and the adjoining property on the south side there was no fence and there had been none for many years; and the testimony tended to show that there were fifteen paths, showing signs of much use, leading into the east yard from the south side, one of which led past the Nappi house.

Before the movement of the cars which caused the intestate's death there were eight cars standing on the Longfield siding. They had been there for some time. One group of six cars extended from near the east end of the Longfield siding, to a point opposite or a little past the west end of the Nappi house. A person standing by the switch at the beginning of the Longfield siding, could not see a person between the tracks at the end of this group of six cars, as the view would be shut off by the cars and the trucks.

On the day of the accident, a freight train running from Island Pond, Vermont, to Bethel, Maine, reached Gorham at 12.50 p. m. with about a dozen cars, and in switching some of these cars onto the Longfield siding the Nappi boy was killed. No one went to the

west end of the group of six cars before the cars were moved to ascertain if anyone was in danger.

The evidence tended to show that pedestrians used the right of way in the east yard, and that children played there.

Other facts appear in the opinion.

*Goss & James (Mr. Goss* orally), for the plaintiff.

*Rich & Marble* and *Drew, Shurtleff, Morris & Oakes (Mr. Marble* orally), for the defendants.

PLUMMER, J.   The plaintiff claims that under the statute the defendants were bound to erect and maintain a fence between their right of way and the adjoining land occupied by him and his intestate, sufficient to prevent the intestate from going upon the railroad tracks, and that the failure of the defendants to provide such a fence made them guilty of negligence, and liable in this action.

This raises the question whether railroads in this state must provide fences by the side of their rights of way that will prevent persons from going upon the railroad tracks.   The first act passed by the legislature relating to the fencing of railroad rights of way was in 1840.   Laws 1840, c. 498, s. 4.   From that time to the present, the statutes of the state have always contained provisions for fencing by the side of railroads.   R. S., c. 142, s. 6;  C. S., c. 150, s. 46;  G. S., c. 148, s. 1;  G. L., c. 162, s. 1;  P. S., c. 159, s. 23.   These enactments are all similar in their effect.   The existing statute (P. S., c. 159, s. 23) provides that "The proprietors of every railroad shall erect and maintain a sufficient fence upon each side of their road, except at the crossings of public highways; and at every such crossing they shall construct and maintain, upon each side of the highway, sufficient cattle guards or fences to prevent cattle from passing upon their road."

The plaintiff contends that this statute imposes upon railroads the duty to erect and maintain a fence sufficient to keep persons from going upon their tracks in thickly populated sections.   The statute would not seem to warrant such interpretation.   Section 5 of chapter 143 of the Public Statutes defines a sufficient fence as follows: "All fences four feet high and in good repair, consisting of rails, timber, boards, or stone wall, and all brooks, rivers, ponds, creeks, ditches, hedges, and other things deemed by the fence-viewers to be equivalent thereto, shall be accounted legal and suffi-

cient fences." While this section is contained in the chapter of the statutes relating to partition fences, still it was the definition in our laws of a sufficient fence when the railroad fencing statute was enacted, and it seems probable that the legislature by using the words "sufficient fence," meant such a fence as was defined to be sufficient in the general statutes referring to fences. A fence meeting the requirements of a sufficient fence under chapter 143 would be absolutely inadequate to prevent persons from going upon railroad tracks. This points to the conclusion that the fence provided by the railroad fencing statute, like the partition fence, was intended to prevent cattle and other domestic animals, rather than people, from going upon railroad tracks. If it had been the legislative purpose to provide that railroads should erect and maintain fences that would stop persons from passing upon the tracks, the legislature would have attempted to have required fences effectual for that purpose. The statute itself bears evidence that the fence therein provided for was intended to prevent animals rather than persons from passing upon railroad tracks; for the latter part of section 23 states that at public highway crossings the railroads "shall construct and maintain, upon each side of the highway, sufficient cattle guards or fences to prevent cattle from passing upon their road." It has been the general understanding that the fence required by the statute was for the purpose of preventing animals from escaping onto railroad tracks. In *Dean* v. *Railroad*, 22 N. H. 316, the court said: "At common law, owners of adjoining lands owe each other no duties, and are subject to no obligations to maintain fences. By our statute, they are bound, if the lands are improved, to maintain the partition fence equally. Rev. Stat. chap. 136. As owners of land, where they own their track, railroad companies are subject to the same liabilities as other owners." The liability of other owners under the above statute was to maintain a partition fence against animals, not people. The court in *Chapin* v. *Railroad*, 39 N. H. 53, 60, said: "We have, therefore, no hesitation in holding, that, under the existing statutes of this State, railway companies are only bound to maintain fences on both sides their track for the benefit of the owners and rightful occupants of adjoining lands, to prevent the cattle of such owners or occupants from escaping from the adjoining lands upon the track of their roads." *Carpenter*, J. in *Hill* v. *Railroad*, 67 N. H. 449, stated: "Cattle-guards, like other fences, are required for the purpose of preventing cattle from entering on the land or track of the railroad. But it is only against the owner

or custodian of animals rightfully on the adjoining land or in the highway that railroads are obliged to maintain fences or cattle-guards." It has always been held that the duty of a railroad to fence was to adjoining owners, and not to the general public. In *Woolson* v. *Northern Railroad*, 19 N. H. 267, 269, the court said: "The statute relates to matters exclusively between the railroad corporation and the owners of land bordering upon the road. It imposes no duty in which the public in general have an interest, or of which the public have any means to enforce the discharge." This construction, placed upon the railroad fencing statute soon after it was enacted, has always been followed. *Towns* v. *Railroad*, 21 N. H. 363; *Cornwall* v. *Railroad*, 28 N. H. 161; *Horn* v. *Railroad*, 35 N. H. 169; *Chapin* v. *Railroad, supra; Mayberry* v. *Railroad*, 47 N. H. 391; *Giles* v. *Railroad*, 55 N. H. 552; *Cressey* v. *Railroad*, 59 N. H. 564; *Morse* v. *Railroad*, 66 N. H. 148; *Hill* v. *Railroad, supra; Casista* v. *Railroad*, 69 N. H. 649; *Flint* v. *Railroad*, 73 N. H. 141. An examination of these cases should convince any one that the railroad fencing statute applies only to domestic animals. If the purpose of the legislature had been to require railroads to erect fences to prevent persons from going upon their tracks, it would not have enacted a law that applies simply to owners of land bordering upon the railroad, but it would have been a comprehensive statute including the general public.

In Massachusetts, the statute requires that railroads shall erect and maintain suitable fences, which has been construed to mean fences suitable to protect the cattle of adjoining landowners and to prevent their intrusion upon the railroad locations. *Menut* v. *Boston & Maine Railroad*, 207 Mass. 12. In other jurisdictions, having railroad fencing statutes somewhat similar to those of this state, it has been held that they apply to animals and not to persons. *New York Cent. &c. R. R. Co.* v. *Price*, 159 Fed. Rep. 330; *Bischof* v. *Railroad*, 232 Ill. 446; *Nolan* v. *Railroad*, 53 Conn. 461; *Baltimore &c Ry. Co.* v. *Bradford*, 20 Ind. App. 348; *Lake Shore &c. Ry. Co.* v. *Liidtke*, 69 O. St. 384.

It would be unreasonable to require railroads to erect and maintain fences sufficient to prevent persons from going upon railroad tracks. Such a fence could not be erected at a reasonable expense. As was said in *Baltimore etc. Ry. Co.* v. *Bradford, supra, p.* 355: "What manner of a fence could a body of law makers describe which would be sufficient to prevent children from going upon the right of way of a railroad company? Certainly no fence which would be

sufficient to turn horses, cattle, sheep and hogs, as is specified by our law, would offer much of an obstacle to the ordinary boy four years old and upward, who might conclude in the absence of parental care, to climb over it."

It is the contention of the defendants that by reason of warning signs posted at the Glen street crossing they are not liable in this action under chapter 75, Laws of 1899, unless the accident was occasioned by the wilful or gross negligence of the railroad. The plaintiff urges that the above statute is unconstitutional, or if constitutional, that it is not a defence to this action. Without regard to the claims of the parties respecting the warning signs, the defendants are not liable unless they were guilty of negligence at the time the accident occurred. The plaintiff's intestate was a trespasser upon the railroad tracks when he was killed. The fact that he was an infant makes no difference. *Clark* v. *Manchester*, 62 N. H. 577; *Frost* v. *Railroad*, 64 N. H. 220; *Buch* v. *Company*, 69 N. H. 257; *Casista* v. *Railroad, supra*. Notwithstanding the plaintiff's intestate was a trespasser at the time he was killed, "it was the duty of the defendants in the exercise of ordinary care to avoid injuring him through their active intervention, if they knew of his presence in a dangerous situation, or if their failure to learn of it was due to their culpable ignorance. In other words, they were in fault if they failed to use due care to discover his presence in a position of danger when circumstances existed which would put a man of average prudence upon inquiry." *Myers* v. *Railroad*, 72 N. H. 175; *Buch* v. *Company, supra; Davis* v. *Railroad*, 70 N. H. 519; *Hobbs* v. *Company*, 75 N. H. 73.

The presence of the Nappi boy on the track before the accident was not known to any one, and, therefore, the defendants are not liable unless they were in fault for not discovering him. There were on the Longfield siding before the accident eight freight cars, in two groups, one group of six cars extended from near the easterly end of the siding to about opposite the Nappi house; then there was a space of two or three car lengths, after which was the other group of two cars. Just previous to the accident a train crew of four men took some freight cars down the Flynn siding and switched them onto the Longfield siding, and in running the cars onto that siding the group of six cars on the siding was moved westerly and run over the Nappi boy, two cars and one truck-frame passing over the body. The Flynn siding runs next to and by the side of the Longfield siding, and there is a level grade between them. When the train crew were

taking the cars down the Flynn siding past the two groups of cars and the Nappi house, they did not see the Nappi child or any children on or about the Longfield siding or the cars thereon. A clerk to the supervisor of tracks was riding on top of one of the cars when they were passing down the Flynn siding, and continued riding there all the time the cars were being switched onto the Longfield siding, and he did not see the Nappi child or any children on the track or about the two groups of cars. It was only a few minutes before the accident that the freight cars passed down the Flynn siding by the two groups of cars and the Nappi house, and these men saw no children on or about the track near the Nappi house. As the cars moving down the Flynn siding reached the easterly end of the group of six cars on the Longfield siding, a brakeman stopped to do the coupling, and remained there during the switching. When the cars reached the switch from the Flynn to the Longfield siding, another brakeman stopped, and remained during the switching. In view of the circumstances it does not appear that the accident was caused by the negligence of the employees of the railroad. The switching was apparently done in the ordinary way; a brakeman was stationed at the end of the cars to which the cars being switched were to be coupled, and another brakeman at the switch. It is true that children were on the tracks in that vicinity more or less, and, if the train crew had not just passed by these groups of cars, and seen no children on or about the tracks, they should have gone alongside of the two groups of cars, and seen if any children were there. The conduct of the train crew was reasonable; they had seen just before they switched the cars onto the Longfield siding that there were no children on or about that track, and there was no reason why they should anticipate any danger to the Nappi child or any one else. The train crew not only did not see the Nappi child, but from the evidence as to his movements, it seems probable that he was not on or about the track as they passed by. When he went onto the track no one knows, but apparently during the few minutes from the time the train crew went by to the time when the cars were switched onto the Longfield siding. It could not be found that the failure of the train crew to discover the child was negligence, and there was no error in directing a verdict for the defendants.

*Exception overruled.*

All concurred.