Hillsborough,
Feb. 2, 1932.

ETHEL B. LOVETT *v.* MANCHESTER STREET RAILWAY.

FRANCIS J. PERRY, *by his mother and next friend, v.* SAME.

LEON L. LOVETT *v.* SAME.

SAME *v.* SAME.

346

*Hurley & Connor* (*Mr. Connor* orally), for the plaintiffs.

*Warren, Wilson, McLaughlin & Bingham* (*Mr. Bingham* orally), for the defendant.

SNOW, J. The defendant maintains and operates a double track trolley line centrally located on Elm street in the city of Manchester. The street runs north and south, and is between eighty and ninety feet wide between curbs. The trolley wires were originally supported by a line of iron poles situated between the two tracks. These poles were located pursuant to a license granted the defendant by the board of mayor and aldermen on April 19, 1895, in accordance with P. S., c. 81, s. 2; P. L., c. 97, s. 2. In 1928 it was decided to substitute for the "so called center construction" a curb or side line construction on a portion of the street. Accordingly, on April 3, of that year, the defendant was granted authority by the city pursuant to P. L., c. 97, ss. 2, 3, 7, to locate lines of poles at the curb on "each side of Elm street from Myrtle street [northerly] to North street." Prior to the day of the accident, the defendant acting under this authority had reconstructed the trolley line from Myrtle street northerly as far as Sagamore street, a distance of about eight blocks. As the poles were

erected at the curbs the corresponding center pole was removed. The plaintiffs' car collided with the most southerly pole of the remaining central line. This pole was located at a point about forty feet north of the center of Sagamore street.

The city was engaged in resurfacing and ditching the easterly side of Elm street, and had excavated between the curb and the easterly rail of the defendant's easterly track from about the center line of Sagamore street southerly for two blocks, a distance of about five hundred feet. This excavation resulted in the diversion of north bound vehicular traffic to the tracks of the defendant for that distance. The excavation had existed for a period of about three weeks prior to the accident. The city guarded it at night by wooden horses at the ends and by red and flare lights on the sides.

On August 23, 1929, the plaintiffs, *en route* from Lowell, Massachusetts, to Meredith, were traveling northerly on Elm street. The car was an Essex "left hand drive." The plaintiff, Leon, was driving, his wife Ethel was riding beside him and her son Francis occupied the rear seat. As he approached the excavation the driver turned to the left, and was proceeding "well over in the car tracks," "well toward the center of the street," at a speed of between fifteen and twenty miles per hour when the car came in collision with the pole. The point of the contact on the car was a little to the left of the center of the radiator. The force of the impact was such as to demolish the front end of the car and produce serious injuries to the three occupants.

The accident occurred about 9:30 o'clock in the evening. The city maintained street lights every two blocks. There was a 1000 watt arc light suspended over the street by an arm reaching from a pole situate at the southwest corner of Elm and Sagamore streets. The car was equipped with standard headlights which were in good condition and burning, and with a vacuum windshield wiper which was working. There was evidence that there had been a thunder shower and that it was still raining. The atmospheric condition is variously described as "dark," "rather dark," "very dark," "kind of murky, dark," "the air was thick like just before a fog." The pole was eight inches in diameter and painted dark green or black. Its presence was not indicated by any barricade, warning light or sign. Both the driver and his wife, Ethel, testified that they did not see the pole prior to the collision.

There is no merit in the plaintiffs' contention that, upon the defendant's acceptance of the license of April 3, 1928, the locations of

the center line of poles which had been authorized in 1895 were thereby *eo instante* revoked, and that therefore the pole in question was illegally in the street (*Thompson* v. *Company*, 77 N. H. 92, 93), and its presence there evidence of the defendant's negligence. No such an impractical condition is imposed by the statute, and no intention to prescribe such a limitation is to be inferred from the terms of the license. It is true that the location of any given center line pole was impliedly revoked by the later grant of locations for the corresponding side poles, but such revocation became effective only when the substitution had been accomplished. There is no evidence that curb poles had been substituted for the pole in question. Neither the statute nor the license prescribed or limited the time within which the granted right was to be exercised. The pole was rightfully where it was at the time of the accident.

The issue, therefore, raised by the defendant's exception to the denial of its motion for a directed verdict, so far as it relates to its negligence, is whether there was evidence from which it could be found that the pole, under the conditions obtaining, presented a hazard requiring protective action known to the defendant or of which it was chargeable with knowledge.

Upon this issue the defendant relies upon the want of evidence that it had notice of "any dangerous condition in the . . . pole." The determination of this question requires an analysis, and separate consideration, of the factors which conspired to make its condition and situation dangerous. The hazard which the plaintiffs encountered was the result of a combination of circumstances. The removal of the poles to the south, in the course of the trolley line reconstruction, had opened the railway roadbed to vehicular travel and left this pole standing in the line thereof as a frontier pole unprotected by its former fellows. The excavation by the city had diverted the whole north bound traffic to the center of the street and in approximate line with the pole. Weather conditions which tended to obscure the pole to an approaching driver completed the hazard. The question presented is whether or not it could be found on the evidence that the defendant either knew of these several conditions or was chargeable with knowledge thereof.

The defendant was operating an important public utility over the city's main thoroughfare. Elm street not only accommodated congested local traffic but carried the travel of one of the state's principal arteries. The defendant's cars passed either way every few minutes of the busy hours of the day. It cannot be seriously contended that

the officers in control of the company's trackage were ignorant of an excavation five hundred feet in length along its rails which diverted the entire north bound traffic to its roadbed for that distance, and which had existed in this condition for a period of three weeks in the height of August travel. Such an occupation of the defendant's roadbed concerned the duties of the motormen. They had to act with view to, and to deal with, the diverted traffic. They were charged with, and expected by the defendant to assume, all responsibilities growing out of the operation of their cars in the midst of such traffic. *Saunders* v. *Railroad*, 82 N. H. 476, 478. It necessarily follows that the knowledge of the motormen, as respects the existence of the excavation and the consequent diversion of travel to the company's tracks, was that of the defendant.

It may be remarked in passing that for this reason the defendant takes nothing by its exceptions to the admission of evidence of the frequency with which the cars passed and of the consequent opportunities which the operators had to observe the city's obstruction to traffic.

Notice of the occupation of its roadbed by the diverted traffic charged the defendant with knowledge of the nature and extent of such occupation. Any examination would have disclosed that the excavation extended to within forty feet of the exposed pole; that the natural course of the diverted traffic was approximately, if not directly, in line therewith; and that a traveler who should follow the line of the detour along the center of the street, would be compelled to swing to his right to avoid a collision with the pole. There was evidence that "if you were not careful going up the easterly side, you might slip over the right side of the right hand car track." The relation of the excavation to the pole was thus too intimate and patent to escape the notice of one who had any duty to protect the traveling public from the company's instrumentalities in the highway. The hazard of the pole to travelers by reason of the limited path of travel and the devious course necessary to avoid it was likewise obvious to any one required to give it attention. The defendant knew the diminutive size and want of distinguishing features of the pole. It was bound to anticipate the darkness incident to night time and possible obscuring weather conditions. The absence of evidence of a previous night of like conditions is of no importance. The defendant was chargeable with an apprehension of all contingencies which persons of average prudence would foresee under the circumstances. *Ela* v. *Company*, 71 N. H. 1, 3. It could be found on the evidence

that a man of ordinary prudence in the defendant's position, through reasonable inspection, would have discovered the potential danger of the obscure and unguarded pole to a traveler whose vision might be affected by the head light of opposing cars or by darkness or fog, and would accordingly have taken protective action.

This conclusion makes it unnecessary to consider the question, discussed at length by opposing counsel, whether or not it was within the scope of the duty of the motormen or conductors to observe and report to the company the hazard of the pole to vehicular traffic as distinguished from the existence of the excavation and consequent occupation of the roadbed by the diverted traffic. This question has not been considered.

There is no merit in the defendant's argument that it is not chargeable with knowledge that the pole presented a hazard to a traveler because it had a right to assume cars would be equipped with lawful headlights, and that the driver would proceed only at a speed commensurate with their projected rays whatever the atmospheric conditions might be. Such a position disregards the imperfections of human instrumentalities, the limitations of the human senses and the fallibility of the human judgment, in contemplation of all of which the defendant was bound to act. To adopt the defendant's view would be to hold, as a matter of law, that it could regulate its conduct with view to a utopian perfection in men and machinery which has not yet been attained.

The plaintiffs' cause is not dependent, as the defendant seems to assume in argument, upon the proof of a duty on its part to anticipate some action of the city which would render the maintenance of the unprotected pole dangerous. The situation so far as it was created by the city was an accomplished fact. As we have seen, the only thing depending upon anticipation was atmospheric and traffic conditions which would complete and make effective a potentially dangerous situation which had existed, to the imputed knowledge of the defendant, for three weeks prior to the accident.

It may be conceded that the city, which produced the situation resulting in making the location of the pole hazardous, was negligent in not extending its protection to cover it. This, however, in no way relieved the defendant from its duty. "Neglect of a third party to take measures to protect the plaintiff from the results of the defendant's fault does not excuse the defendant. *Stevens* v. *Company*, 73 N. H. 159." *Derosier* v. *Company*, 81 N. H. 451, 460. Moreover there is no evidence the city had assumed to protect the public from

the pole, or that the defendant was relying on such protection. So far as appears the city had limited its protective action to barriers and lights about its excavation. It had merely diverted the travel from its usual course to the middle of the street. Where one is depending upon another's action to protect him in a positive way ordinary care requires some attention to what that other does. *Burke* v. *Railroad*, 82 N. H. 350, 356. The defendant, so far as appears, gave the situation no attention.

In support of its contention that the driver's contributory negligence was conclusively shown, the defendant relies upon the absence of affirmative proof that he was looking ahead, and upon the claim that the admitted facts that the lights were in perfect order and the wiper working compel the finding that, if he had been looking and had been exercising ordinary care, he could not have failed to see the pole in season to have stopped before reaching it. The absence of proof does not avail the defendant upon this issue. No evidence of the driver's care was necessary as a part of the plaintiff's case. P. L., c. 328, s. 13; *Burelle* v. *Pienkofski*, 84 N. H. 200, 202. In so far as the record discloses his conduct, it does not show that he was not looking ahead. True, he did not state the direction in which he was looking, nor was he asked. He however did state that he was driving "well toward the center of the street," and described his line of travel by reference to the tracks which he says he was following. As respects the visibility of the pole, the inference to be drawn from his testimony that he could not see it was confirmed by the testimony of his seatmate. She testified that she was looking straight ahead as she approached the pole, or its vicinity, and that she could not see it; that the first indication she had of its presence was the "crash." She had testified to seeing the excavation. Her qualifying words, and her lack of recollection of having observed other objects along the way, go only to the weight of her evidence. The testimony of both witnesses tends to show that the pole was indiscernible to an occupant of the front seat of the car approaching under the conditions that obtained. Another witness who arrived early at the scene of the accident from the south testified that the pole was not easily discernible to a person approaching from that direction under the conditions existing that evening. Besides the murky darkness of the night other findable facts impairing the effectiveness of the lights to disclose the pole included the motion of the car over the tracks and cobble stone surface and the variance in the course of the car ordinarily incident to making a detour. It cannot be said that all reasonable men must

agree that the failure of the driver to observe the obscured pole was due either to a failure to look or a want of care in looking.

The defendant's motions for a nonsuit and a directed verdict were properly denied.

Subject to the defendant's exception, one Sullivan, called by the plaintiff, was permitted to testify that while proceeding northerly on Elm street at 11:30 o'clock in the evening of August 20th, three days before the accident, his car collided with the pole. The evidence was offered and admitted solely to show the dangerous situation. It was relevant to that issue, and therefore admissible, if the similarity of the conditions was sufficient to make it of assistance to the jury. Whether there was such similarity was a question of fact for the trial justice whose finding was conclusive if there was evidence to support it. *Bailey &c Co.* v. *Railroad*, 78 N. H. 94, 95, 97; *Fisher* v. *Railroad*, 75 N. H. 184, 185; *Dow* v. *Weare*, 68 N. H. 345, 346; *Cook* v. *New Durham*, 64 N. H. 419, 420; *Griffin* v. *Auburn*, 58 N. H. 121, 124; *Darling* v. *Westmoreland*, 52 N. H. 401. It was shown that the same situation and conditions obtained as respects the excavation and the pole; that the witness was making the same detour in the same direction as the plaintiffs; that the occurrence happened in the night time within three days of the accident here; that the witness' car collided with the same object and that it was not discernible to him. The defendant contends in argument that the required similarity is wanting because the record is silent as to the headlights and other equipment of the car, its speed, the state of the weather and normality of eyesight of the driver. These grounds were not called to the attention of the court. The exception was general, namely, that the evidence did not tend to show the situation was dangerous. Had the objections now urged been specified at the trial, a different ruling might have been made, or the plaintiff might have presented evidence upon the points suggested. Justice requires that they should not be insisted upon after the verdict. *Bailey &c Co.* v. *Railroad*, *supra* 98. Proof of exact similarity in all respects is not required. Substantial similarity is sufficient. *Id.*, 97, and cases cited. It cannot be said as a matter of law that there was such a want of similarity in the conditions as to render evidence of the earlier accident of no use to the jury in determining whether the pole presented a dangerous situation. Its admission was not error.

The plaintiffs were allowed to introduce, without objection, the defendant's application of March 20th, 1928, for the location of the side line poles. It contains on its face a recital that "Pole locations

are granted subject to the laws of the State of New Hampshire and certain conditions which are printed on the back of this application, to which the applicant hereby agrees, provided the permission herein applied for is granted." The conditions referred to include the following— "1. Excavations, obstructions or encumbrances shall at all times be properly guarded, barricaded or fenced during the whole time the highway is excavated, obstructed or encumbered, and lights shall be maintained throughout the night so that all excavations, obstructions and encumbrances may be readily seen. 2. The grantee hereby agrees to indemnify and save harmless the City of Manchester, N. H., for all claims for damage or injury whatsoever that may arise from the excavation, obstruction, encumbrance or occupation of said highway, and the applicant shall be accountable for all damage that may occur on account of said excavation, obstruction or encumbrance of the aforesaid highway under this grant, the City of Manchester in no case assuming any responsibility or liability by reason of the issuing of this grant." The defendant excepted to the denial of its motion to strike out the conditions, on the ground that "it has no materiality as to the location of the poles. Digging the holes and guarding them has nothing to do with this issue." The objection is untenable because the conditions clearly show the railway's obligation to take care of the danger of the situation which the pole created. Other grounds, not specified at the trial, cannot now be urged. *Bailey &c Co.* v. *Railroad*, 78 N. H. 94, 98.

Exception was taken to the question and answer of the defendant's superintendent, called by the plaintiffs; "Q. (*Mr. Connor*) When did you remove the poles north of Sagamore Street . . . *The Witness:* Last summer [1930] some time." The pole in issue was one of the poles covered by the question. It is urged in support of the exception that its removal might be construed as an admission of negligence on the part of the defendant. The accident had happened in 1929. The trial occurred in May 1931, at which a view was taken which unavoidably disclosed the absence of the pole. Its removal was an intervening material change in the situation which was competent to be shown in explanation of the view and for no other purpose. The particular day it was taken away was unimportant. If the evidence was thought by the defendant to be prejudicial, its use could have been limited by appropriate instructions. None were requested. The defendant takes nothing by its exception.

In the course of the examination of the defendant's manager, called by the plaintiffs, the following colloquy with reference to the applica-

tion of March 20, 1928, took place: "Q. (*Mr. Connor*) What was the purpose of this petition? *Mr. Warren:* Objected to. *Mr. Connor:* That is competent, I think. I think that is material, if you will let me proceed. *The Court:* It speaks for itself, doesn't it? *Mr. Connor:* It requires explanation and I want to go into it. I want another reason for the relocation of those poles. *Mr. Warren:* I except to that statement." A conference at the bench followed, and no further reference was made to the subject. The defendant contends that the statement of counsel was calculated to convey to the jury an impression that the petition was an admission that the maintenance of the center pole construction was hazardous to traffic to the knowledge of the defendant. Counsel's statement was in the nature of an argument in support of his offer to show some purpose for the petition that did not appear therein. In view of the disallowance of the offer, which is to be inferred from the record, and the statement of the court that the application "speaks for itself," it would seem improbable that the jury drew any inference from the statement unfavorable to the defendant, much less that the jury could have given any weight to the innuendo which the defendant interprets the remark to carry.

*Judgments on the verdicts.*

All concurred.