Rockingham, ⎞
March 5, 1935. ⎠

MABEL JOHNSON SMITH, *Adm'x v.* BOSTON & MAINE RAILROAD.

FLORENCE A. SMITH *v.* SAME.

*Robert W. Upton* and *John H. Sanders* (*Mr. Upton* orally), for Mabel Johnson Smith, Adm'x.

*Sleeper & Perkins* (*Mr. Sleeper* orally), for Florence A. Smith.

*Hughes & Burns* (*Mr. Burns* orally), for the defendant.

PAGE, J. The deceased was killed and Miss Smith was injured while walking on the track of the defendant near Rockingham Junction at about quarter before seven in the evening. At this point the two main-line tracks run north and south, but the easterly track is known as the east-bound, and the other as the west-bound. These tracks are crossed at the junction by the defendant's line from Concord to Portsmouth, and the station building is located north and west of this intersection. The deceased and Miss Smith were struck from the rear by a portion of a freight train backing southerly on the east-bound track while they were walking in the same direction, on the same track, bound for the village of Newfields. The evidence was conflicting as to the exact point of accident, but for purposes of this discussion it may be assumed that it was approximately 1500 feet southerly of the station, as contended by the defendant, although other estimates would place it further south.

The train movements resulting in the accident were occasioned by the fact that a special freight *en route* from Worcester to Portland and drawn by two locomotives had to be divided because of knuckle trouble near Exeter. The fore part of the train, forty-three cars, was drawn by the second engine into Rockingham, where it arrived shortly before six o'clock and pulled onto the passing siding easterly

of the east-bound track. This portion of the freight had no caboose. The northerly switch of the passing siding was about 800 feet south of the station, and the engine took position far enough south of the switch to permit the passage of trains on the east-bound track. The engine and attached freight cars held this position until after the accident.

After repairs were made, the rear portion of the freight, forty-six cars and the caboose, was drawn by the leading locomotive into Rockingham, where they arrived on the east-bound track at half past six. Since an east-bound passenger express was following, the second portion of the freight was drawn north until the caboose cleared a cross-over whose east-bound switch was something more than 500 feet southerly of the station. The cars were then backed by way of the cross-over onto the west-bound track, and the east-bound express went through.

By this time a west-bound express (number 80) was ready to pass through. In order to clear the track the freight cars were drawn forward through the cross-over and onto the east-bound track. The switches having been reset for main-line clearance, the conductor of the freight gave signal for the express to move southerly on the west-bound track, and it could be found that immediately after he gave that signal he gave another for the freight section to back southerly on the east-bound track so far as to clear the northerly switch on the passing siding, permitting the two locomotives to be coupled and the two portions of the freight rejoined. The simultaneous movements of the express and the freight cars in the same direction on the main-line tracks began at approximately a quarter of seven.

A few minutes before that the deceased, who had been working at the station handling baggage, mail, and express, though not as the defendant's employee, had finished for the day and had started to walk along the defendant's right of way towards his home at Newfields. The plaintiff Florence Smith had walked up from Newfields to meet him and go back with him, and it could be found from the evidence that she actually met him at a point 1100 feet south of the station. The evidence also warrants the finding of the further facts now to be related.

As Miss Smith came northerly to the meeting place she observed the freight cars on the siding and the second portion of the freight on the west-bound track. She also saw the latter pulling northward onto the east-bound track. Upon meeting Johnson she turned and walked southerly with him, his arm about her waist, along the shoul-

der of the west-bound track. While so walking, they heard a whistle behind them, turned and saw the headlight of express number 80. Due to the condition of the shoulder ahead of them, the east-bound track appeared to be a safer place under the circumstances. Accordingly they crossed diagonally to the east-bound track, looking again to the north and seeing only the headlight of the express, and then proceeded southerly between the rails of the east-bound track.

The caboose had two or more rear lights, but Miss Smith did not see them or the cars, and she was not particularly looking for any movement on the east-bound track from the north. If she or Johnson had seen the caboose lights at the time they entered the east-bound track, it would have been at a distance of about 500 feet and at that moment the backing movement would not have brought the freight cars more than 200 feet in their southerly course, making it difficult to perceive that their direction had been reversed. Both could be found not to have heard any sound from the freight unless it was its whistle rather than that of the express that they heard. Miss Smith in fact inferred at the time that she heard the express whistle. As the express overtook Johnson and Miss Smith, the fireman, knowing their danger and seeing that they were ignorant of it, shouted and waved from the cab of the express engine. The caboose was then about 180 feet from the pedestrians. Miss Smith did not hear what was shouted, but supposed it to be a friendly greeting. Johnson waved back. They proceeded walking, and shortly after the express engine passed they were struck by the rear of the caboose.

I. For many years prior to the accident the defendant's right of way had been commonly used by pedestrians passing in both directions between Rockingham and Newfields, and it could be found that the defendant ought to have anticipated the presence of pedestrians at this time. Under these circumstances, the initiation of a simultaneous movement in the same direction on both tracks without precautions for their protection might be found to be negligent.

A rule of the defendant, and custom and practice, might be found to require that a trainman must take a conspicuous position on the front of the leading car (in this case the rear of the caboose). No trainman was so stationed, but such a trainman, if present and standing on the step of the caboose, could have reached for an airbrake lever, moved it a few inches, and in about two seconds the brakes would have been set throughout the length of the train. The cars would then have stopped within the distance of forty to sixty feet.

It could be found also that prior to the moment when the express

engine passed the plaintiffs, the latter had been in the east-bound track, or going towards it, plainly illuminated by the express headlight, for a period of more than twenty seconds, during which time, it would be reasonable to conclude, a vigilant trainman on the rear of the caboose would have seen them and taken precautions to stop the freight. He could have taken action to bring it to a stop before it reached the point at which the fireman tried to warn the plaintiffs. Moreover, after the moment of the warning that failed to register, the freight cars (at 12 miles per hour) traveled 270 feet and the pedestrians 90 feet (4 miles per hour) before the point of impact was reached. That further progress required fifteen seconds, in which time there was ample further opportunity to avoid the accident.

This is not, therefore, a case like *Goy* v. *Director General*, 79 N. H. 512, where there was no evidence that a lookout on the rear of the caboose would or could have prevented the accident. It is not controlled by *Ellsmore* v. *Director General*, 80 N. H. 100, for here there is some evidence of a custom of pedestrians to walk between the rails in a direction contrary to the usual movement of traffic on those rails, a custom of which the defendant might be found to have notice. It might further be noted that we are dealing here with a case of customary use by pedestrians, not (as in *Garland* v. *Railroad*, 76 N. H. 556, 567) with a chance or casual trespass neither known to the employee at fault nor anticipatable by the defendant.

The presiding justice told the jury that it was unnecessary to distinguish between duties owed by the defendant under the circumstances to invitees, licensees and trespassers; that if they should find the use of the right of way by pedestrians had been such that the railroad would be charged with reasonable anticipation of the presence of the plaintiffs upon the right of way at the time they were injured, it was the defendant's duty to exercise reasonable care to avoid injuring them by setting some force in motion. This was the correct statement of the duty with respect to trespassers. *Myers* v. *Railroad*, 72 N. H. 175; *Nappi* v. *Railway*, 78 N. H. 261, 266; *McCaffrey* v. *Company*, 80 N. H. 45, 54; *Dillon* v. *Company*, 85 N. H. 449, 452. It is as favorable a rule as the defendant could ask. The general statement that the duty is the same to all whose presence is reasonably to be anticipated (*Minot* v. *Railroad*, 73 N. H. 317, 321) will, when applied to some situations, require care in handling the facts. "The only qualification is that C's wrong might be a circumstance affecting A's care in his case . . . . But the duty to use such care as the circumstances demand is not modified, and the difference is an

issue of fact and not of law." *Dillon* v. *Company, supra,* at page 455. Upon the facts of this case no need for qualification appears.

In *Myers* v. *Railroad, supra,* it conclusively appeared that the plaintiff was negligent, and the defendant was held not bound to anticipate his negligence in placing himself in a dangerous position. But the question whether or not Johnson and Miss Smith were negligent in walking along the east-bound track was one for the jury, and until the jury found them negligent in so doing the defendant could not claim the benefit of the *Myers* case.

On the question of the plaintiffs' care, it could be found that the glare of the headlight of express 80 blinded them so that there was no conclusive want of care in their not seeing the caboose or its rear lights before they stepped onto the east-bound track.

If they failed to hear the bell on the freight locomotive more than 1900 feet away at the far end of more than forty-five cars, or if they thought its whistle was that of the express engine, they were not necessarily negligent. When and how often, if at all, reasonable care required them under all the circumstances to look behind, as they walked on the east-bound track, was clearly a question of fact for the jury. *Bourassa* v. *Railway,* 75 N. H. 359, 360; *Burns* v. *Coté,* 86 N. H. 167, 169.

The holding that one is conclusively negligent in going under certain circumstances as to visibility upon a track where the normal movement of trains is from his rear (*Bursiel* v. *Railroad,* 82 N. H. 363) does not require that the same result be reached when under somewhat similar circumstances as to visibility another person enters and moves along a track where the ordinary movement of trains is from the direction in which he faces. The requirements of due care vary with differing circumstances. There may be circumstances where even a total lack of precaution is not conclusive proof of negligent conduct. *Minot* v. *Railroad,* 73 N. H. 317. "Precaution is a duty only so far as there is reason for apprehension." *Shea* v. *Railroad,* 69 N. H. 361, 364.

The motions for nonsuits and directed verdicts were properly denied.

II. The brother of the deceased was permitted to testify that he and the deceased had walked along the tracks together on one or more occasions shortly before the date of the accident. The defendant objected on the ground that the testimony was incompetent as evidence of custom and habit, there being "affirmative evidence of the situation at the time of the accident." It is now explained that the ob-

jection was to the evidence as bearing upon the issue of the contributory negligence of Johnson. This point does not seem to have been made clear at the trial, and there is no suggestion that the plaintiff offered the testimony upon that issue. The court remarked that it was "evidence of general use of the track" and admitted it. The defendant took only a general exception. The evidence was admissible for the purpose stated by the court, and if the defendant felt that there was danger of the jury using it for some other prejudicial or irrelevant purpose, the matter should have been brought clearly to the attention of the court by a request for instructions limiting its use. Having failed to do this, the defendant takes nothing by the exception. 1 Wig., Ev., s. 13; Lord v. Railway, 74 N. H. 295, 298; Caplan v. Caplan, 83 N. H. 318, 325.

III. Subject to the defendant's exception, a large number of witnesses testified to the use of the defendant's right of way by themselves and others for the purpose of walking from Newfields to Rockingham and between the same points in the opposite direction. The defendant argues that, while such testimony is proper as to the use of a defined path crossing the tracks (Mitchell v. Railroad, 68 N. H. 96; Minot v. Railroad, 73 N. H. 317), it would be an improper extension of the doctrine to enlarge the area of common trespass to a stretch of tracks about a mile in length, used for walking along the tracks rather than across them.

The argument overlooks the purpose and relevancy of testimony of use, which is to establish reason for the defendant to anticipate the presence of persons who might be injured by forces it sets in motion. While the existence of a beaten path might under some circumstances be evidence of its use by others than employees of the railroad, evidence of the actual presence of others in the path would in most cases be more persuasive than the path itself.

The distance from station to station over which pedestrians were testified to have passed is argued as not charging the defendant with notice of the presence of the plaintiffs at the exact place and moment of the accident. But since the evidence was that people commonly walked for years the whole distance, in both directions and at all times of the afternoon and evening, it would be a fair inference that each of them at some moment of each trip reached a point 1500 feet from the station, and that some one might be at that point at any moment until late evening. And there was testimony that some were accustomed to walk between the rails of the left hand track, so that the evidence cumulatively warrants the very inference the defend-

ant doubts. From the supposedly burdensome result of the inference we cannot relieve the defendant by saying that any of the evidence was irrelevant.

The court properly denied the request for an instruction that evidence of the use of the tracks by pedestrians in the daytime could not be considered as charging the defendant with knowledge that similar use was being made in the night time. While use in the daytime would be less persuasive than use in the night time, it cannot be said that knowledge of use in the daytime under the circumstances here disclosed would have no tendency to cause reasonable men to anticipate such use after dark.

IV. The testimony of a witness that while walking on the tracks she had occasionally waved to trainmen and they had waved back may have been used by the jury for either or both of two purposes: (1) to charge the defendant with reasonable anticipation of the presence of pedestrians, and (2) to sustain the impression of Miss Smith that when the fireman of the express waved to the plaintiffs he was giving them a friendly greeting. The testimony was insufficient to establish a custom, and Miss Smith does not appear to have known and relied on the instances testified to. Consequently the evidence could not be used properly to sustain her impression, but since the defendant's exception is general only and there was no request to the court to limit the use of the testimony, we have to pass only upon its admissibility for the former purpose.

The defendant cites several cases as authority for the contention that knowledge of the trainman would not charge the defendant with the duty of anticipating the presence of pedestrians. The camp boss who invited a boy to visit him at a lumber camp had no authority to make him the invitee of the owner, but his knowledge of the boy's presence and the similar presence of others, coupled with knowledge of other employees that people frequently came to the camp without the invitation of the owner and not upon his business, seems to have been treated as evidence charging the defendant with knowledge of the boy's presence. *Hobbs* v. *Company*, 74 N. H. 116. The lack of authority of a manager to make his personal guest the invitee of the employer was declared in *Castonguay* v. *Company*, 83 N. H. 1, 5, but nevertheless the supposedly negligent operative's actual knowledge of the presence of the trespasser was held to be the knowledge of the employer.

The other cases relied on by the defendant go no further than to decide that a given agent had no authority to bind his principal by

some specific act, that he had no authority to receive a statutory notice, or that actual knowledge of an agent uncommunicated to the principal is not the actual knowledge of the latter. But the jury, in this instance, were given testimony that the use of the tracks by pedestrians was so open that they could reasonably find, in connection with the other evidence, that it was notorious and that the defendant, if in the exercise of average prudence, would have known of it and would have anticipated the presence of the plaintiffs.

The chain of which this testimony was a link did not consist of "one or two remote instances of the kind" (*York* v. *Clow*, 86 N. H. 76, 78). It was admissible with other evidence upon the openness and notoriety of the use. Without regard to the duty of the trainman to communicate his knowledge to the defendant, a point not decided, it may be said that what was open enough for the trainman to know might be deemed open enough for the defendant to know. For the same reason, it was proper to admit the testimony of a witness that while he was in the employ of the defendant he observed that it was the custom of Johnson to go home by way of the tracks. As to trainmen there is the further consideration that knowledge of the actual or probable presence of others by an agent whose duty it is to act in the light of such presence is the knowledge of the employer. *Lovett* v. *Railway*, 85 N. H. 345, 349.

At the plaintiffs' request and subject to the defendant's exception, the jury were instructed that "even if the defendant's train crew, engaged in the movement of its cars at the time of the accident, had no cause to anticipate the presence of pedestrians on the track, this would not relieve the defendant from the duty to exercise reasonable care for the safety of the pedestrians using its track at the time, if the defendant, through other employes, had knowledge or notice that pedestrians were likely to make use of its tracks, in season to take reasonable precautions to avoid injury to such pedestrians."

This stated with substantial correctness the rule as to knowledge and anticipation of the presence of all trespassers except casual ones, provided that one bears in mind that knowledge or anticipation could come to the defendant only through its employees. Recognizing this, the defendant urges that the instruction should have been qualified by a statement that it was not chargeable with knowledge acquired by other employees than those actually negligent unless those having such knowledge hold some peculiar position that makes their knowledge imputable to the defendant.

This technical reasoning about the authority of agents may be

brushed aside for purposes of this case by the mere statement that the evidence warrants the conclusion that the right of way was used as a thoroughfare for pedestrians and in such open fashion that anybody connected with the railroad (including any agent having a "peculiar position") must, if he came that way frequently, know of the fact unless he deliberately closed his eyes. When the use is notorious, the defendant is not permitted to escape liability because the employee actually negligent was ignorant of the notorious fact. If such an employee's ignorance is pleaded, it is a sufficient answer that the defendant had the duty of giving him such information and instructions as reasonable care requires under the notorious circumstances. *Mitchell* v. *Railroad,* 68 N. H. 96, 116.

V. Subject to exception the plaintiffs introduced testimony that the defendant had not posted notices forbidding trespass on its tracks in this locality. Since the extent of the defendant's liability would have been affected by the posting of signs, it was proper for the plaintiff to prove what the fact was.

VI. Miss Smith was permitted, subject to exception, to testify as to her beliefs that the freight section was proceeding on its way to Dover and that the signal given by the fireman of the express was a friendly greeting. The defendant insists that she should have been confined in those regards to what she saw and heard. Such testimony of belief is permitted when it is gained from observation (1 Wig., Ev. *s.* 658) or when the belief is connected with some act of the witness which is in issue, unless it is excluded because irrelevant or forbidden by some other principle (1 Hening, Digest, 598, 599). Here the beliefs were related to both observation and conduct, and were relevant to the issue of what Miss Smith in fact anticipated or failed to anticipate.

In a case like this, the first inquiries are (1) what the plaintiff actually knew of his situation, and (2) what he must be held to have known, though ignorant of it. *Davis* v. *Railroad,* 70 N. H. 519, 523. These facts ascertained, the conduct of the plaintiff may be tested. "Carelessness means wrong thinking or failure to think in connection with action." *Collette* v. *Railroad,* 83 N. H. 210, 217. The testimony objected to was relevant to the issue of what Miss Smith knew. Whether she thought wrongly as to what she knew, or did not think at all regarding what she ought to have known, or whatever may have been her actual mental processes, her thinking and conduct were to be tested by the thoughts and conduct of the average person under the same circumstances. *Sevigny* v. *Company,* 81 N. H. 311, 312.

The defendant urges that testimony of this nature should be excluded because it permits a witness to state a conclusion reached after the time of the conduct in issue. The testimony was of a state of mind existing at the time of the conduct. It may be conceded that a witness may make such a statement wishfully or falsely. But so might a witness do as to any memory of fact or observation. In this respect, "He did," or "I saw," or "I believed," cannot be distinguished. Where intent to defraud was in issue, it was said that the plaintiff "could, of course, testify to his intentions. It was a matter concerning which he would have the means of positive knowledge, and the only question would be as to his veracity, and that is solely a question for the jury." *Graves* v. *Graves*, 45 N. H. 323, 324.

Such testimony is attacked as self-serving. It is admissible unless its use is forbidden by some rule of exclusion, and there is no such rule based on its mere character for self-service. *Caplan* v. *Caplan*, 83 N. H. 318, 326.

Miss Smith also testified that she felt perfectly safe on the eastbound track and would not have walked there if she had not. She was describing mental states and reasoning coincident with her act in walking along the track. This testimony differs only slightly in quality from that already considered. It seems proper as testimony of one's reasons for doing an act. *Janvrin* v. *Fogg*, 49 N. H. 340, 353; *Moore* v. *Davis*, 49 N. H. 45, 55. It was relevant to the questions of anticipation and the quality of her thinking in connection with action, and into both matters the jury must inquire, using the judgment of the person of average prudence as the test of the judgment she exercised.

VII. The testimony of Miss Smith that by reason of the injuries sustained in the accident she had a horror that her legs might be paralyzed was properly received. The fact of a fear so caused, if found by the jury, would be an element of damages for their consideration, even though the fear was mistaken. That the fear regarded a possibility rather than a probability would not alter the reality of the mental suffering unless the jury found the fear so fantastic as to make them believe that it was not in fact entertained. Whether the one entertaining the fear has done all he reasonably could to control his apprehension may be inquired into on the principle of mitigation of damages.

Complaints of mental pain, when in issue, stand on the same ground as complaints of physical pain when that is in issue. *Caplan* v. *Caplan*, 83 N. H. 318, 324. The cases excluding possible future

damages as distinguished from probable ones are not in point. This is not the case of an opinion that Miss Smith may suffer paralysis; it involves the statement as matter of fact that she has been continuously suffering from the fear of that possibility. If found to exist as the result of the defendant's fault, such suffering would entitle her to damages, and an instruction to the jury to disregard the apprehension would have been error. *Walker* v. *Railroad*, 71 N. H. 271, 273 (fear of insanity). In the case just cited there was some discussion concerning the probability that the fear would be followed by actual insanity, but the discussion came to nothing. There was no attempt to distinguish between the probability of the existence of a present apprehension and the probability of its realization at some time in the future. The later case of *Sanders* v. *Railroad*, 77 N. H. 381, did not require either an overruling or a clarification of the *Walker* case.

In *Prescott* v. *Robinson*, 74 N. H. 460, a pregnant mother was held entitled to damages for apprehension, before the birth of her child, that it would be deformed as the result of her injuries. She was denied recovery for the mental pain she would undoubtedly suffer in the contemplation of the child's deformity and sufferings after birth. Such damages were called remote, but the reasoning of the decision was that the child was a separate person after birth and that the mother could not have damages for her suffering because of injuries to a third person. We do not have that element here.

The lack of probability that Miss Smith will ever have paralysis would not alone preclude her recovery for an actual, if erroneous, apprehension that she in fact suffered from because of her injuries. "Proof that the child was or was not deformed when born would not affect the amount of the mother's recoverable damage . . . [citing *Prescott* v. *Robinson, supra*]. The award to her is on account of her apprehension. ... It is a question of her mental suffering before the child is born. The existence of such suffering is not disproved by evidence that if she had been thoroughly versed in medical science she would have known that her fears were groundless." *Bowley* v. *Duca*, 80 N. H. 548, 551.

VIII. The defendant excepted to the introduction in evidence of certain rules of the defendant. One was rule 103: "When cars are pushed by an engine, except when shifting or making up trains in yards, a trainman must take a conspicuous position on the front of the leading car." The other was rule 100: "When the brakeman goes back to protect the rear of the train, the baggage man or next

trainman must, in the case of passenger trains, and the next brakeman, in the case of other trains, take his place on the train." At the time of the accident, the rear brakeman of the freight was many hundreds of feet in the rear, for protection from east-bound trains, and nobody was on the caboose of the freight. The defendant also excepted to testimony of custom and practice similar to the rules. It was agreed that the place of accident was not a yard.

The objection that these rules were immaterial because of lack of evidence that they applied to the situation (*Minot* v. *Railroad*, 73 N. H. 317, 321) is not tenable, since there was evidence upon which their application to similar situations could be found. It is also contended that the rules were not properly receivable as admissions by the defendant of what due care required, or as admissions of negligence.

The point is not well taken. The determining factor in the case of *Derosier* v. *Company*, 81 N. H. 451, was that the plaintiff, at the time of injury, had not yet entered the zone of danger in which the rule and custom were operative. The defendant here takes the position that its rule did not apply to the place of accident. If that is correct, the rule and custom were not admissions of a duty the defendant owed to the plaintiff. But the correctness of the position of the defendant that the rule and custom did not apply to the place of accident was brought into issue by the evidence, and the question of application was for the jury. If applicable to the place, the rule was an admission of duty. If not applicable to the particular place, the rule and custom might yet, because offered generally, be regarded as "evidence of a kind of protection which might be found to be suitable if protection . . . were found to be a duty of the defendant." *Derosier* v. *Company, supra,* 457.

In this instance the evidence has a tendency to show that the defendant had knowledge of a kind of protection suitable under certain circumstances. The controversy in the course of the trial must then turn largely, as the record shows it did, upon the question whether the circumstances in which the rule and custom were followed were similar to those in which the defendant's employees found themselves on this occasion.

The defendant contended that the rules and custom were not applicable to the train movement on the night in question. The evidence was conflicting upon this point, and the defendant insisted throughout that the application of the rules must depend solely upon its own interpretation. Its chief examiner testified that Rule 103

was not applied in shifting anywhere. Shifting, he also testified, is always a part of the making up of trains. The result of this testimony would be that the rule would not apply to the pushing of cars in making up trains at Rockingham Junction. If that interpretation is adopted, shifting being excepted everywhere, it would seem that the rule could not apply to pushing cars in making up trains anywhere, and since "anywhere" includes yards, the exception "in yards" would be superfluous and meaningless. Obviously no such interpretation needs to be considered as having exclusive authority.

Consequently it was not error for the court to deny a request for instructions that rule 103 must be applied solely in accordance with the construction placed upon it by the defendant. A further instruction was sought to the effect that the rule was not adopted for the benefit of the public in general (a fact to say the least not conclusively proved) and this "fact" was urged in the request as a reason for adopting the defendant's interpretation. The defendant was properly denied that support for its doubtful interpretation.

The defendant also requested an instruction that, as the plaintiffs had no knowledge of the rule, any non-compliance with it as interpreted by the plaintiffs was not evidence of negligence. This had the same purpose of taking from the jury the question whether the rule was applicable and instructing them that the defendant's construction must be followed. Further, it would have had a tendency to persuade the jury erroneously that reliance on the rule by the plaintiffs was necessary in order to establish the negligence of the defendant. Reliance on the rule might have had some probative value on the question of contributory negligence (*Bursiel* v. *Railroad*, 82 N. H. 363; *Chabott* v. *Railway*, 77 N. H. 133), but reliance on or knowledge of the rule by the plaintiffs has nothing to do with the use of the rule as evidence of a precaution which prudent men would take (*Minot* v. *Railroad*, 73 N. H. 317, 321) or of the kind of protection that might be found suitable (*Derosier* v. *Railroad*, 81 N. H. 451, 457). All the other instructions sought regarding the rule centered about the idea that the defendant's interpretation must be adopted. It was not error to refuse to give them.

The exception to the instruction given by the court regarding the rule, custom and practice as to having a trainman on the end of the caboose when cars were being backed is largely disposable upon the same ground. But this and another exception to the denial of a request that the plaintiffs' evidence of custom and practice did not apply are urged on the ground that the plaintiffs' sole witness on these

points had no knowledge of train movements at Rockingham Junction, and testified only from general knowledge regarding movements not in yards. Since the witnesses for the defendant alone had knowledge of the particular place, their position seems to be that all other evidence is to be disregarded. The propriety of the jury's considering the general evidence for what it was worth is apparent.

The defendant does not complain that the presiding justice submitted the interpretation of the rule to the jury instead of determining that question himself. The contention of the defendant is that no tribunal could pass on the interpretation and application of the rule and practice. It says that the rule must be taken as interpreted by its own expert witness. But if expert testimony was involved, somebody had to pass upon its credibility, and whoever did so might well find it incredible. The defendant's experts cannot be the sole judges of their own infallibility.

The plaintiff produced a witness who testified as to a practical interpretation of the rule that conflicted with the testimony of the expert of the defendant. The defendant objected that the witness had nothing to do with making the rule, that the rule was made by the railroad and could not be varied by the interpretation of persons other than those who made it. The defendant did not claim that the rule could be varied by its expert but did put him forward as the sole interpreter. That could not be permitted when there was evidence of practical interpretation to the contrary, and especially when the expert's interpretation carried internal evidence of infirmity.

The jury were instructed in substance that if they found the presence of pedestrians ought reasonably to have been anticipated, the duty arose to exercise due care to avoid their injury by active intervention; that if such care required the formulation and enforcement of rules, instructions and regulation as a means of avoiding such injury, that duty was owing from the defendant to the plaintiffs. This was correct.

IX. No error is perceived in the admission of testimony that the backing of the freight cars could have been delayed until the express had passed on. The situation presented by the simultaneous southerly movement on both main tracks, while the siding was occupied by cars, was such that reasonable men might have foreseen the possibility of entrapping expectable pedestrians in the very manner the plaintiffs were caught.

X. The engineer of express 80 testified without objection that he could have stopped his train under the existing conditions in sixty

or seventy-five feet. He was then asked whether, if his fireman had told him that he saw two people crossing a track ahead four or five hundred feet away, there was any question that he could have stopped his train very quickly. Because of the confusion of the colloquy that ensued, during which the defendant objected and excepted and the court ruled that the question might be answered, the question was not in fact answered. The exception to non-existent evidence presents no question of law.

The defendant further excepted to the denial of its request that the issue of last clear chance be withdrawn from the jury. The only evidence on this issue was the distance within which the express could have been stopped and the ease with which the engineer could have blown the whistle. The plaintiffs contend that this evidence was proper to go to the jury to establish the fact that the defendant, through the fireman who alone had actual knowledge of the plaintiffs' presence, had the last clear chance to avoid their injury by stopping the express north of the point of accident or by a warning blast of the whistle notifying them of their danger so they could move to safety.

The issue could not be submitted properly unless there were evidence upon which it could be found (1) that the fireman was actually aware of the plaintiffs' ignorance of their peril or of their inability to extricate themselves from it, and also (2) that after his discovery of this situation, due care required and time afforded an opportunity for saving action. *Clark* v. *Railroad, ante,* 36.

If it be assumed that the fireman owed the duty to avoid injury to the plaintiffs by reason of the active intervention of an instrumentality of the defendant not in any degree under his control, the burden was still upon the plaintiffs to show that "time afforded an opportunity for saving action." There is no evidence at all during what period, if any, prior to the attempted warning the fireman was actually aware of the fact that the plaintiffs were ignorant of their peril or unable to avoid it. Consequently the jury could do no more than conjecture that he had an opportunity to save them.

It would be conjectural whether either suggested action would have saved the plaintiffs. They could be saved only by their own action after becoming aware of their danger. The mere stopping of the train at some vague point north of the place where they were run down could give them opportunity to step in front of the express, but would give them no warning to do so and no assurance that such a movement on their part was safe. The blowing of the whistle in addition to the stopping, whether just before or just after, would be as

likely to keep them off the west-bound track as to warn them to leave the east-bound track. Nor was there time to stop the train and enable the fireman to jump off and either impress the plaintiffs with their danger or drag them to a place of safety.

The jury should not have been permitted to consider this theory of the defendant's liability in view of the lack of evidence warranting the finding of a last chance that was clear.

XI. Miss Smith was in an automobile accident subsequent to the injuries complained of, and, as bearing upon her physical condition and her activities, the later accident was inquired into. On cross-examination Miss Smith denied that she was intoxicated on the night of the automobile accident, and the defendant offered a police officer and a probation officer to contradict her denial of intoxication. They were allowed to testify as to her appearance and breath on the occasion, but were not permitted to show that she was told that she was drunk or that she was in fact arrested for drunkenness.

Though Miss Smith's ability to go on an automobile trip may be regarded as evidence that her injuries were not so serious as her complaints suggested, it is difficult to see how the fact that she was able to drink liquor and become intoxicated had any tendency to show that her physical injuries or her mental suffering were less than she claimed. But even if she might be contradicted on this issue, it was entirely proper for the court to exclude evidence (1) that an officer told her she was drunk and (2) that she was arrested on that charge. That is not the way to prove intoxication, which is the only thing Miss Smith denied.

XII. Other exceptions to evidence are not considered, since the questions involved are unlikely to arise at the next trial.

XIII. The defendant requested instructions to the effect that it had the exclusive right to use its tracks for train movements. The instructions were given without the word "exclusive," and the defendant excepted. While the defendant's right of user was exclusive in the sense that the plaintiffs had no such right, the adoption of that word might have misled the jury into the belief that the defendant could run its train when and as it willed, without reference to the expectable presence of the plaintiffs. The relative rights of the parties were stated with sufficient exactness, and the omission of the word "exclusive" was not error.

XIV. The court did not err in denying requests for instructions that the plaintiffs were trespassers. The instructions would have been immaterial in view of the theory on which the case was sub-

mitted. Nor was it error to refuse to instruct the jury that the defendant owed no duty to the plaintiffs because the particular employees whose acts were complained of did not actually know of the presence of the plaintiffs. If the employees had taken precautions to ascertain whether anybody was on the track, their want of actual knowledge that the plaintiffs were present would not be the saving factor for the employees; they would be saved by their precautions. *Nappi* v. *Railway*, 78 N. H. 261, 267.

XV. The jury should have been instructed, as the defendant requested, that no inference of the care of the deceased should be drawn from the instinct of self-preservation. *Greenwood* v. *Railroad*, 77 N. H. 101. The natural desire for a continuance of life leaves the jury, in a case like this, to a pure conjecture whether the deceased was careful or careless. *Wright* v. *Railroad*, 74 N. H. 128.

XVI. The defendant requested an instruction that it could not be charged with negligent failure to sound the whistle or ring the bell of the freight engine attached to the cars that struck the plaintiffs. There was a further request to withdraw this particular issue of negligence from the jury. Both were denied subject to exception. There was positive evidence that the whistle and bell were sounded. Miss Smith heard a whistle that she supposed to be from the express engine, but no bell. There was no evidence that she was listening for either whistle or bell. There was positive evidence that there was noise from the express that might have muffled or drowned other sounds. There was no evidence for the jury that the signals in question were not given, nor could it be found that the plaintiffs' injuries were caused by the want of such signals. *Niemi* v. *Railroad*, *ante*, 1. The issue in this regard should have been narrowed by instructions that there was no evidence upon which it could be found that the signals were not given, and by further instructions that would assist the jury to judge of the care of the plaintiffs in the event it were found that the signals were actually given but the plaintiff failed to hear them or interpret them correctly. *Peppin* v. *Railroad*, 86 N. H. 395, 401.

XVII. Other requests for instructions have been disposed of by what has been said upon other points. Still others were covered by instructions given with substantial justice to the defendant.

XVIII. The theory upon which the case was submitted, disregarding any supposed distinction between the duty of the defendant toward trespassers and invitees, being correct as applied to the particular facts, could not prejudice the defendant. If any prejudice

might have arisen prior to argument from the admission of evidence on the issue of invitation before the lines were clearly drawn, it might be regarded as removed by the instructions. But after the lines were drawn and the theory of submission determined, the question whether the plaintiffs were trespassers or invitees became wholly immaterial, as the court stated. It is conceivable that the argument of counsel for the administratrix that the deceased was not a trespasser,—an immaterial matter,—would confuse the jury or arouse a prejudicial notion that in spite of the instructions the plaintiffs in some way stood in a better position than they did, or conversely that the defendant owed them some greater degree of care, and this in spite of an instruction by the court that the plaintiffs did not claim they were invitees. At the next trial it will probably be possible to avoid either party's dwelling upon immaterial matters.

XIX. Other exceptions to argument have been incidentally passed upon in this opinion. Still others involve the argument of inferences that might be drawn from the evidence. It is not to be supposed that at a new trial the court will omit to instruct the jury to disregard argumentative statements that are withdrawn. The remaining questions that have not been considered are unlikely to arise at a later trial.

*New trial.*

All concurred.